**Carl BOWLES, Plaintiff,**

v.

**CITY OF CAMDEN, et al., Defendants.**

**No. CIV.A. 96–4907 JEI.**

United States District Court,
D. New Jersey.

Feb. 2, 1998.

Linda B. Kenny, by Steven P. Monaghan, Red Bank, NJ, for Plaintiff.

Dennis G. Knile, City Atty. of Camden, NJ, by M. Edward Rivas, Asst. City Atty., Camden, NJ, for Defendants.

## OPINION

IRENAS, District Judge.

The instant dispute arises from the termination of plaintiff Carl Bowles ("Bowles"), Director of the Public Works Department of the City of Camden ("City"), by defendant Arnold Webster ("Webster"), Mayor of the City. In addition to defendant Webster, plaintiff is suing the City, the individual members of Camden's City Council, and Patrick Keating ("Keating"), the Business Administrator for the City. Presently before the Court is the defendants' motion for summary judgment on plaintiff's claims for retaliatory discharge under New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A.

34:19–1 *et seq.*, and for violation of the First Amendment under 42 U.S.C. § 1983. Plaintiff also seeks damages for defamation and, pursuant to N.J.S.A. 40:69A–43(c), for termination without a hearing. Defendants move to dismiss these claims, as well as the CEPA claim, on the basis that this Court will no longer have supplemental jurisdiction under 28 U.S.C. § 1367 if the § 1983 claim, the only claim under federal law, does not survive summary judgment. For the reasons that follow, this Court will deny the motion for summary judgment of the City and Mayor Webster, grant the motion for summary judgment of the City Council members and Keating, retain jurisdiction over plaintiff's state claims, and allow this case to proceed to trial against Webster and the City.

## I. BACKGROUND

Shortly after his election to City Mayor, defendant Webster interviewed plaintiff Bowles for the position of the City's Director of Public Works. Bowles was sworn in on January 1, 1994. *See* Bowles Dep. at 24; Webster Dep. at 20. From June of 1995 through March of 1996, the Attorney General's office undertook an investigation into possible criminal violations taking place in the Department of Public Works. *See* Robertson Dep. at 7. The investigation concerned potentially unlawful practices in the awarding and execution of demolition contracts in the City of Camden. *See* Lytle Dep. at 7. Prior to Bowles' swearing in, Department of Public Works' employees had been convicted of similar criminal charges after ongoing investigation by the Attorney General's office. *See* Bowles Dep. at 22. Bowles apparently was aware of rumors of alleged public works scandals, schemes and kickbacks when he began working as the Director of Public Works. *See* Bowles Dep. at 22.

In November, 1995, Mr. William Robertson ("Robertson"), an investigator with the Attorney General's office, approached Bowles regarding the criminal investigation he was conducting into Camden's Public Works Department. *See* Bowles Dep. at 27–28. Bowles agreed to provide Robertson with general information regarding the ongoing demolition projects handled by the Public Works Department. *See* Bowles Dep. at 43–44. He also agreed to cooperate with Robertson by helping him monitor these projects and the Public Works' employees involved with them. *See* Bowles Dep. at 43–44.

After his initial meeting with Robertson, Bowles informed Keating, the Business Administrator for the City, of Robertson's criminal investigation and his request for Bowles' cooperation. *See* Bowles Dep. at 46. Keating allegedly told him to continue cooperating fully with the investigation. *See* Bowles Dep. at 67. Bowles also alleges that he informed Mayor Webster about his cooperation with the Attorney General's investigation. *See* Bowles Dep. at 49. He claims that he first informed the Mayor of the criminal investigation two days after his first interview with Robertson. *See* Bowles' Dep. at 49. He then claims he spoke personally with both Keating and Webster several times afterwards about the status of his cooperation with Robertson. *See* Bowles' Dep. at 52, 65, 67. Keating testified that there were several criminal investigations of corruption or illegal activities within the Camden government conducted by the Attorney General's office and others during Mayor Webster's administration. Law enforcement officers visited Keating at least ten times while he was the Business Administrator and Keating discussed these meetings with the Mayor. *See* Keating Dep. at 37–38. Nonetheless, Webster denies having been informed of Bowles' participation with the Attorney General's office and claims that he was unaware that a criminal investigation of the Public Works Department was being undertaken. *See* Webster Dep. at 66. However, Webster allegedly encouraged Bowles to cooperate with the law and claims he supported Bowles' investigation of the activities of those employees for whom he was responsible. *See* Bowles Dep. at 42, 49, 50.

Bowles' cooperation with Robertson enabled Robertson to identify potential City employees who were violating the law. Bowles provided information to Robertson about certain individuals suspected of creating problems or violating rules, regulations and criminal statutes. Generally, the information he provided regarded job position and

his personal assessment of an employee's performance of his duties. *See* Robertson Dep. at 12. Bowles also provided information on job locations, where certain targeted employees would be working, what kind of work was being performed, and information pertaining to demolition sites. *See* Robertson Dep. at 13, 17.

As a requirement of Bowles' cooperation, Robertson asked Bowles to refrain from firing or otherwise moving personnel around in the demolition section of the Public Works Department. *See* Bowles Dep. at 53; Robertson Dep. at 22. Robertson informed Bowles that it was important to keep the same people in the same positions so that they could be monitored. *See* Bowles Dep at 53; Robertson Dep. at 24. Bowles testified that he wanted to move personnel around in order to address problems in the department, but refrained from doing so per instructions from the Attorney General's office. *See* Bowles' Dep. at 54. He allegedly informed both Keating and Mayor Webster that he was refraining from taking personnel action because of his compliance with the Attorney General's request. *See* Bowles Dep. at 73–75. Bowles told Robertson that he had advised Webster about his cooperation in the investigation. *See* Robertson Dep. at 22. Webster, however, allegedly having had no knowledge of the Attorney General's investigation, denies ever having been informed that Bowles was refraining from making personnel changes at the request of Robertson. *See* Webster Dep. at 59.

Robertson recalls a meeting scheduled for Robertson, Bowles and Webster at the Diamond Diner, Webster's favorite diner in Cherry Hill. *See* Robertson Dep. at 19. At the meeting, the men were going to discuss the Attorney General's criminal investigation into the Public Works Department. *See* Robertson Dep. at 19. However, the meeting was canceled at the last minute because of a funeral which the Mayor had to attend. *See* Robertson Dep. at 19. Robertson testified that he was present when Bowles called Webster on the telephone and was informed by Webster that the meeting would have to be canceled and rescheduled. *See* Robertson Dep. at 19. The meeting was not rescheduled and never took place. Webster denies that such a meeting was ever scheduled. *See* Webster Dep. at 76.

On April 30, 1996, Webster informed Bowles of his intention to terminate him. Webster called Bowles to his office and presented him with a letter informing him that he would be officially terminated in thirty days. *See* Bowles Dep. at 68; Exh. A to Pl. Compl. Webster then verbally informed Bowles that he would have thirty days to improve his performance before he was terminated. *See* Bowles Dep. at 68. Despite Webster's offer of an opportunity to demonstrate improvement, Mayor Webster had no contact with Bowles during the thirty-day period to determine whether or not Bowles had improved his performance. *See* Webster Dep. at 47. Webster admits he made no efforts to follow up on Bowles' performance during this period. *See id.* He further admits that he never told Bowles that his job might be in jeopardy prior to April 30, 1996. *See* Webster Dep. at 56.

On May 10, 1996, Bowles forwarded a memorandum to Webster seeking an opportunity to exercise his statutory right to a hearing prior to his termination. *See* Exh. Webster 2–D to Webster Dep. By regulation, he is entitled to notice and opportunity to be heard before being removed. N.J.S.A. 40:69A–43(c). Webster denies receiving Bowles' memorandum. *See* Webster Dep. at 52. Bowles was never given his statutorily prescribed hearing prior to his termination. *See* Webster Dep. at 57. Furthermore, despite claiming to give Bowles thirty days to turn his department around, Webster apparently concluded by May, 16, 1996 that Bowles' termination would in fact occur as scheduled. On that day, he sent a letter to the President of the City Council notifying the Council of his decision to fire Bowles as of June 1, 1996. *See* Exh. Webster 3ID to Webster Dep.

Webster offers several different, and perhaps inconsistent, reasons for his decision to terminate Bowles. In the April 30, 1996 termination letter, Webster alleged that his reason for terminating Bowles was "extreme management differences." *See* Exh. A to Pl. Compl. Webster then claimed the termi-

nation was a result of the handling of a large snowfall. *See* Webster Dep. at 68. In an editorial authored by Webster in response to media allegations that Bowles was fired as a result of his cooperation with the criminal investigation, Webster wrote that the reason for terminating Bowles was "gross incompetence." *See* Webster Dep. at 71; Exh. F to Pl. Compl. He stated that he should have fired Bowles sooner. *See* Exh. F to Pl. Compl. Webster also wrote in his editorial that Bowles was an "outright liar" for claiming he had told Webster about the ongoing criminal investigation, further concluding that "he was a complete fool" if he had not told him about the investigation. *See* Exh. F to Pl. Compl.

While Webster claims that people within the department complained to him about Bowles, he cannot recall the name of one person who approached him with such complaints. *See* Webster Dep. at 21. Keating was routinely made aware of employee disciplinary actions. He does not recall any disciplining of Bowles prior to his termination. *See* Keating Dep. at 54. Webster cannot recall how many people supposedly complained, nor can he recall when they complained. *See* Webster Dep. at 21. Bowles was never reprimanded for his alleged lack of control over personnel. *See* Webster Dep. at 25. Webster made no entries in Bowles' personnel file concerning his alleged lack of control over personnel. *See* Webster Dep. at 27, 31. While Webster claims a problem with Bowles' management style, when asked, he cannot provide a single example of any managerial skills or management tasks with which he was dissatisfied. *See* Webster Dep. at 34. Webster has no notes of any meetings where he discussed a problem with Bowles' management style. *See* Webster Dep. at 34.

Contrary to the testimony of Keating, Webster claims that concerns over Bowles' alleged lack of control over personnel were discussed at weekly staff meetings. *See* Webster Dep. at 21–23. Keating states that Webster never discussed Bowles' performance as Director of the Public Works Department at the weekly cabinet meetings. *See* Keating Dep. at 16–17. Bowles claims that he was commended by Webster for his performance in Public Works on several occasions. *See* Bowles' Dep. at 72–73. Personnel problems existed in the department prior to Bowles taking over. *See* Keating Dep. at 20. In fact, it was widely recognized that the department presented a difficult job to any director and that there were "certain characters" in the department who were hard to deal with. *See* Keating Dep. at 19. Bowles admits that he faced challenges with personnel in the department. He asserts that some employees were not trained to do their jobs and took offense at his attempts to train them. *See* Bowles Dep. at 26. He also acknowledges that he received resistance from some of the subordinate supervisors, *see* Bowles Dep at 30, and that the politics among certain factions presented problems. *See* Bowles Dep. at 28. Although Bowles was certainly challenged by his job as director of such a large and previously troubled department, observers testified that he did his best to rise to the challenge. *See* Robertson Dep. at 23–24. Keating stated that, in his opinion, Bowles was not any worse than any of his predecessors. *See* Keating Dep. at 19.

Plaintiff filed his complaint in this Court on October 17, 1996. He set forth causes of action alleging: 1) violation of the First Amendment and 42 U.S.C. § 1983; 2) violation of New Jersey's CEPA, N.J.S.A. 34:19–1 *et seq.;* 3) violation of New Jersey public policy; 4) termination without a hearing in violation of N.J.S.A. 40:69A–43(c); and 5) defamation. On April 17, 1997, we denied defendants' motion to dismiss plaintiff's first, second, fourth and fifth claims. Because plaintiff's CEPA claim precluded bringing a retaliation claim under New Jersey common law, we dismissed plaintiff's third claim for violation of New Jersey public policy.

## II. DISCUSSION

### A. *Standard of Review*

Under Fed.R.Civ.P. 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A nonmoving party may not rest upon mere allegations, general denials, or vague statements in opposition to a summary judgment motion. If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Bixler v. Central Penna. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Engineers,* 982 F.2d 884, 890–91 (3d Cir.1992).

It is not the role of the judge at the summary judgment stage to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must draw all inferences in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, the Court must accept the non-movant's version as true. *Pastore v. Bell Tel. Co. of Penna.,* 24 F.3d 508, 512 (3d Cir.1994).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. A genuine issue of material fact for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring).

For reasons discussed more fully below, *see infra* Part II, Section G, we will focus our CEPA and § 1983 retaliatory discharge analyses on plaintiff's claims against Mayor Webster and the city. Mayor Webster bears primary responsibility for the decision to terminate Bowles and is therefore the person whose actions deserve the most scrutiny. Because we previously found that the City is not immune under *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), any liability arising from the Mayor's actions will also attach to the City. *See Bowles v. City of Camden, et al.,* No. 96–4907, Slip. Op. at 7–8 (D.N.J. April 17, 1997).

### B. *Retaliatory Discharge Under CEPA*

New Jersey's CEPA provides that:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy of practice of the employer or another employee, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or rule or regulation promulgated pursuant to law.

N.J.S.A. 34:19–3.

▇ The elements necessary to prove a retaliatory discharge claim under CEPA are similar to those necessary to prove a violation of Title VII. *See Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 560, 569 A.2d 793 (1990); *Velantzas v. Colgate–Palmolive Co.,* 109 N.J. 189, 193, 536 A.2d 237 (1988); *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853 (3d Cir.1990) (reversing entry of summary judgment against plaintiff by district court because plaintiff met necessary elements of both CEPA and Title VII). Therefore, we will utilize principles from the Title VII landscape in analyzing plaintiff's CEPA claims.

### C. *Analytical Frameworks For Evaluating Employment Discrimination Cases*

▇ The Supreme Court has developed two analytical frameworks to evaluate a plaintiff's proof of discrimination in an employment discrimination case. The first, often referred to as a "pretext" theory, was developed to address the difficulty in obtaining direct evidence of discrimination. *See Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1071 (3d Cir.1996) (en banc), *cert. denied,* — U.S. ——, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). In a pretext case, a plaintiff must first make a prima facie

case of discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Erickson,* 117 N.J. at 560, 569 A.2d 793; *Velantzas,* 109 N.J. at 193, 536 A.2d 237. In order to establish a prima facie case of discriminatory retaliation under Title VII, and therefore CEPA, Bowles must show "1) that [he] engaged in protected activity, 2) that [his] employer [Mayor Webster and the City of Camden] took adverse action against [him], and 3) that a causal link exists between the protected activity and employer's action." *Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 177 (3d Cir.1997); *see Nelson v. Upsala College,* 51 F.3d 383, 386 (3d Cir.1995); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). If the plaintiff succeeds in establishing these three elements, then the burden shifts to the defendant to advance a legitimate, nondiscriminatory reason for making the adverse employment decision. Once the defendant has proffered such a reason, the plaintiff must raise an issue of fact regarding whether the defendant's proffered explanation is pretextual or whether retaliatory discrimination was more likely than not a determinative factor in the decision. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994); *see Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 n. 2 (3d Cir.1997); *Sheridan,* 100 F.3d 1061; *Jalil,* 873 F.2d at 708.

■ Pretext is "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs;" in essence, pretext is a "cover-up" for a discriminatory purpose. *Loeb v. Textron,* 600 F.2d 1003, 1012 (1st Cir.1979). In order to show pretext, the plaintiff may rely upon evidence which rebuts the proffered reason, so as to allow the fact-finder to conclude that the illegal basis motivated the employer. *See Fuentes,* 32 F.3d at 764. The employee need not submit direct evidence of discrimination, but must only raise a genuine issue of fact suggesting pretext by providing some evidence establishing a reasonable inference that the employer's proffered reason for the adverse employment decision was weak, implausible, inconsistent, incoherent or contradictory so as to be unworthy of credence. *See Fuentes,* 32 F.3d at 764–65. Summary judgment is improper if the plaintiff points to evidence which raises doubt about the employer's proffered basis, *see Geary v. Visitation of the Blessed Virgin Mary Parish School,* 7 F.3d 324, 331–32 (3d Cir.1993); the plaintiff's evidence need not necessarily lead to the conclusion that the employer did not act for the nondiscriminatory reasons. *See Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.1995); *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 205 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988).

■ In addition to demonstrating pretext, a plaintiff may also proceed under a "mixed-motive" theory of discrimination. *See Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 522 (3d Cir.1992) ("Intentional discrimination in employment cases fall within one of two categories: 'pretext' cases and 'mixed-motives' cases."), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). In a "mixed-motives" case, the employee must produce direct evidence of discrimination, *i.e.,* more direct evidence than is required for the pretextual prima facie case. *See Mardell v. Harleysville Life Ins. Co.,* 31 F.3d 1221, 1225 (3d Cir.1994); *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994). Conduct or statements which reflect directly the alleged discriminatory attitude and which bear directly on the contested employment decision constitute direct evidence. *See Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1096 (3d Cir.1995); *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992). If the plaintiff is able to adduce "direct evidence" of discrimination, "and the evidence as a whole permits a conclusion that both permissible and impermissible considerations played a role in the employer's decision, the plaintiff need only show that the unlawful motive was a substantial motivating factor in that decision." *Miller v. CIGNA Corp.,* 47 F.3d 586, 594 (3d Cir.1995) (en banc); *see also Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104

L.Ed.2d 268 (1989). If that is accomplished, the burden of persuasion then shifts to the defendant to prove the discrimination was not a "but-for cause" of the unfavorable employment action. *Miller,* 47 F.3d at 594. In other words, the employer "must show that its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse,* 490 U.S. at 252; *Mardell,* 31 F.3d at 1225 n. 6.

### D. *Pretext Case*

For purposes of analyzing plaintiff's pretextual prima facie case, the parties do not dispute that Bowles' actions of cooperating with the Attorney General's investigation of the Department of Public Works constitute protected activity under CEPA. Bowles provided information to the Attorney General's office to assist in its corruption investigations into the City of Camden. Bowles gave the names of people who were creating problems or potentially violating rules, regulations or criminal statutes. He also offered information on job locations, where certain targeted employees would be working, and what types of jobs were being undertaken at various demolition sites. The parties also do not dispute that Webster's decision to terminate Bowles is an adverse employment decision. Therefore, the only issue requiring resolution under a pretext theory is whether plaintiff has satisfied the third element for making a prima facie case of retaliatory discharge by demonstrating evidence of a causal connection between Bowles' involvement in protected activities and Webster's termination of Bowles in June of 1996.

■ Temporal proximity of the adverse action to the plaintiff's protected conduct can give rise to an inference of causation. *Jalil,* 873 F.2d at 708 (finding evidence of a prima facie case of retaliatory discharge where plaintiff was discharged two days after filing an EEOC complaint). "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation." *Kachmar,* 109 F.3d at 178. Here, we find that temporal proximity supports an inference of retaliation. Although it is disputed precisely when Webster learned of Bowles' involvement with the Attorney General's investigation, the time period during which Bowles cooperated with the investigation coincides with the time period directly preceding Webster's decision to terminate Bowles. Webster may not have decided to fire Bowles at the precise moment he discovered that Bowles was assisting the Attorney General, but given the fact that he terminated Bowles within only a few months after Bowles' initial meeting with Robertson, time during which he may have been waiting to see whether Bowles' cooperation hurt or helped his administration, we feel temporal proximity supports an inference that Bowles' cooperation and Webster's decision to terminate him are closely related.

Defendants argue that temporal proximity alone is not enough to support a causal connection between an employee's protected activity and an adverse employment action. The Third Circuit cases are seemingly split on the question of whether the timing of the allegedly retaliatory conduct can, by itself, support a finding of causation. *Compare Jalil,* 873 F.2d at 708 (3d Cir.1989) (plaintiff "demonstrated the causal link ... by the circumstance that the discharge followed rapidly, only two days later, upon [plaintiff's] receipt of notice of [his] EEOC claim") *with Delli Santi v. CNA Ins. Companies,* 88 F.3d 192, 199 n. 10 (3d Cir.1996) ("timing alone will not suffice to prove retaliatory motive"). In *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997), relying on *Jalil,* the Court stated in dicta that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link."[1] On the other hand, in *Quiroga v.*

---

1. *Woodson* appears to support the proposition that a court could rely on temporal proximity alone, but in rendering its holding on causal connection, the *Woodson* Court placed substantial emphasis on the fact that, in addition to temporal proximity, there was pattern of antago-

nism in the intervening period between the protected conduct and the plaintiff's termination. *Woodson,* 109 F.3d at 921. Thus, the Court's statement that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link," *id.* at 920, does

*Hasbro, Inc.*, 934 F.2d 497 (3d Cir.1991), requiring more than temporal proximity alone, the Court characterized its earlier statement in *Jalil* that the "timing of the discharge in relation to [plaintiff's] EEOC complaint may suggest discriminatory motives" as the holding of that case, and stated that in *Jalil* "we stopped short of creating an inference based upon timing alone." *Id.* at 501. In *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997), the Circuit's most recent pronouncement on the issue, the court stated that "we believe that, if *Jalil* is to be interpreted as holding that timing alone can be sufficient, that holding must be confined to the unusually suggestive facts of *Jalil*. Thus, even if timing alone can prove causation where the discharge follows only two days after the complaint, the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Id.* at 1302 (citing *Quiroga*, 934 F.2d at 501).

■ We feel the better rule is to require more than temporal proximity alone except in those rare cases, like *Jalil*, where the decision to discharge takes place so rapidly after discovery of the participation in protected conduct that the inference of discrimination is impossible to ignore. Thus, we hold that, in addition to temporal proximity, plaintiff must show further evidence supporting a causal connection. Here, we believe that plaintiff has done so by pointing to: (1) the absence of any record that the Mayor or anyone on his staff ever criticized plaintiff for his performance until the Mayor felt the need to publicly defend the firing decision; and (2) the internal inconsistencies in the Mayor's explanations and their inconsistency with the absence of documented dissatisfaction with plaintiff's performance.[2] Both the absence of a documented record of dissatisfaction with Bowles and the inconsistency of the after-the-fact explanations for the firing suggest that Webster's dissatisfaction with

Bowles' performance did not manifest itself until he chose to publicly defend his firing of Bowles.

Defendants have argued that the evidence used to support an inference that a termination was pretextual cannot also be used to satisfy the causal connection prong of a prima facie case. They urge that since Webster did not need any reason to fire plaintiff, inconsistency or contradictions in those reasons cannot be relevant to establishing the causal connection between the protected activity and the termination.

We agree that Webster did not have to give any reason at all for his decision to terminate Bowles. As an at-will employee, Bowles could be terminated by Webster without explanation. *See Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 397, 643 A.2d 546 (1994); *Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 284, 544 A.2d 377 (1988); *English v. College of Medicine & Dentistry*, 73 N.J. 20, 23, 372 A.2d 295 (1977). However, having publicly offered reasons for his decision to terminate Bowles once challenged with accusations of retaliatory discharge, Webster is now subject to scrutiny for his alleged reasons for dismissing Bowles. There is neither logic nor case law which would counsel that the same evidence may not support both the plaintiff's initial burden of proving a causal connection for purposes of making a prima facie case and the plaintiff's final burden of casting doubt on the employer's proffered legitimate reason.

The initial burden of making a prima facie case is relatively easy to meet. *See Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 n. 1 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Overturf v. Penn Ventilator, Co., Inc.*, 929 F.Supp. 895, 899 (E.D.Pa.1996). Furthermore, the nature of the prima facie case necessarily changes depending on the type of employment discrimination at issue and the

not necessarily lead to the conclusion that temporal proximity will be sufficient, without more, in all cases.

**2.** These inconsistencies are discussed more fully in the discussion relating to whether, for pur-

poses of analyzing defendants' rebuttal to plaintiff's prima facie case, Webster's proferred reasons for Bowles' termination were pretextual. *See infra* pp. 265–267.

particular facts of any given case. In the seminal Title VII burden of proof case of *McDonnell Douglas,* the Supreme Court cautioned that the "facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802 n. 13. Since *McDonnell Douglas,* the Supreme Court has held consistently that the *McDonnell Douglas* test forms one model of a prima facie case, not an invariable scheme. *See Int'l Brotherhood of Teamsters v. U.S. et al.,* 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (the Court noted that it was improper for the defendants to argue that the *McDonnell Douglas* pattern was the only means whereby the plaintiff could establish a prima facie case because "[o]ur decision in that case . . . did not purport to create an inflexible formulation"); *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[t]he method suggested in *McDonnell Douglas* for pursuing [the disparate treatment] inquiry . . . was never intended to be rigid, mechanized, or ritualistic"). Similarly, the Third Circuit has noted that the *McDonnell Douglas* prima facie test should not be viewed as a rigid formula. *See E.E.O.C. v. Metal Serv. Co.,* 892 F.2d 341, 347 (3d Cir.1990); *Bryant v. Int'l Schools Servs., Inc.,* 675 F.2d 562, 575 (3d Cir.1982); *Jackson v. U.S. Steel Corp.,* 624 F.2d 436, 440 (3d Cir.1980); *Kunda v. Muhlenberg College,* 621 F.2d 532, 542 (3d Cir.1980) ("of necessity this cannot be an inflexible rule"). Thus, since "[t]he importance of [the prima facie case] lies, not in its specification of the discrete elements of proof there required, but in [the] recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion," *Teamsters,* 431 U.S. at 358, courts must be sensitive to the myriad of ways such an inference can be created. *See Metal Serv. Co.,* 892 F.2d at 347. Simply stated, a plaintiff has established a prima facie case when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons. *See Furnco,* 438 U.S. at 576; *Jackson,* 624 F.2d at 440. On the record before this Court, we feel Bowles has easily established his prima facie case.

■ Webster and the City must now rebut the presumption of discrimination by producing evidence that the plaintiff was terminated for a legitimate, nondiscriminatory reason. Placing the burden of production on the employer serves to rebut Bowles' prima facie case and to "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine,* 450 U.S. at 255–56. Webster and the City have articulated several reasons for Bowles' termination. At various times during his deposition and in his statements to the press, Mayor Webster has claimed that "extreme management differences," "gross incompetence," "lack of control over personnel," and poor handling of a large snowfall all justified his decision to fire Bowles. There is some evidence that Bowles was challenged by his job as head of the Public Works Department. Although plaintiff denies that Webster's reasons are legitimate, he does admit that his job as director of such a large and previously troubled department presented him with a challenge. For purposes of summary judgment, we find that defendants have carried their burden and proferred legitimate nondiscriminatory reasons for Bowles' termination.

Thus, the burden now shifts back to the plaintiff to show that the proffered reasons are pretextual. The present record, as plaintiff aptly demonstrates, is replete with inconsistencies and anomalies casting doubt on Webster's credibility and raising an inference that he did not terminate Bowles for the reasons he claims. An employer's lack of credibility and evidence of inconsistencies and/or anomalies in the record can support an inference that the employer did not act for its stated reasons. *See Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir.1993); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 794 (3d Cir.1990); *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 58–59 (3d Cir. 1988); *Chipollini v. Spencer Gifts, Inc.,* 814

F.2d 893, 895 (3d Cir.1987), *cert. denied,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

Most importantly, Webster has had difficulty articulating precisely why he abruptly terminated Bowles. He has offered many different explanations, but has thus far offered minimal evidence to support any of them. In the April 30, 1996 termination letter, he claims "extreme management differences" as the reason for his decision to terminate Bowles. At his deposition, he states that Bowles' termination resulted from his poor handling of a large snowfall. Webster also wrote in an editorial appearing in the Courier–Post that "gross incompetence" required him to terminate Bowles, claiming that he "should of fired [Bowles] sooner." Exh. F to Pl. Compl.

Webster's support for these proffered reasons raises some doubt as to their legitimacy. Numerous inconsistencies present an inference that he did not act for his stated reasons and therefore preclude summary judgment in his favor. In support of his contention that he fired Bowles because of gross incompetence, Webster claims he received numerous complaints about Bowles. However, he cannot recall the name of one single person who approached him with such complaints. Nor can her recall how many people supposedly complained, when they complained, or what was the specific subject of their complaints. No entries of these alleged complaints against Bowles were made in Bowles' personnel file.

Contrary to the defendants' position that Bowles was unable to handle a department of the size and complexity of Camden, Keating testified that Bowles was not any worse than any of his predecessors. The defense relies on the testimony of the Attorney General investigator, Robertson, in an attempt to support its position that Bowles was incompetent. They cite Robertson's statement that his first impression of Bowles was that he was in over his head as evidence that Webster had a legitimate reason for terminating Bowles. However, the defense cites Robertson's statement out of context. In fact, Robertson's statement tends to show that Bowles' performance significantly improved with time. He stated that as he got to know Bowles better, "[he] became more impressed with his candor and the way he conducted business, the way he was aware of what was going on." "[He] is dumb like a fox in reference to some aspects of what was going on in the city ... I think he became stronger. I think he became a strong leader when he was aware of what was going on, how the processes would be circumvented." Robertson Dep. at 10.

Webster also cites extreme management differences as a reason for Bowles' dismissal. However, when asked about his concern over Bowles' management style, he could not provide any examples of problems he experienced with Bowles' management abilities or his manner of managing the Public Works Department. Webster admits that Bowles was never reprimanded for his alleged poor managerial skills. In fact, Bowles claims that Webster commended his performance on several occasions. Keating, who normally was apprised of employee discipline action, does not recall any disciplining of Bowles prior to his termination. Furthermore, he never made any entries in Bowles' personnel file concerning any problems or complaints about his managerial style.

Webster also claims that his concern about Bowles' lack of control over personnel led him to fire Bowles. Although Webster states that these concerns were discussed at weekly staff meetings, Webster has no notes of any meetings where he discussed his concerns about Bowles' managerial style or expressed his discontent with Bowles' management of the personnel in his department. In fact, Keating states that Webster never discussed Bowles' performance as director of the Public Works Department at the weekly cabinet meetings. Likewise, Webster can offer no record of his alleged discontent over Bowles' handling of the large snowfall.

Webster's credibility suffers from other inconsistencies and inaccuracies in his deposition testimony and statements to the press. For example, Webster claims that he was not aware of any criminal investigation into any department of the City of Camden during his administration. Keating, however, testified that there were several criminal in-

vestigations of corruption or illegal activities with the City government in Camden being conducted by the Attorney General's office during Mayor Webster's administration. Keating stated that law enforcement officers visited him at least ten times while he was the business administrator under Webster. Despite Webster's supposed ignorance of the government's probe into Camden City corruption, Keating claims to have discussed several of these matters with Webster.

More importantly, Webster denies ever being informed of Bowles' participation in the Attorney General investigation. He publicly announced in his editorial and statements to the press that he had no knowledge of the criminal investigation. However, plaintiff has presented evidence which suggests Webster was aware of the investigation and Bowles' cooperation with it. Inspector Robinson testified that Bowles told him that he had advised Webster about his cooperation in the investigation, and that a meeting was scheduled between the Mayor, Robertson and Bowles at the Diamond Diner, the Mayor's favorite diner, to discuss the Attorney General's investigation. Robertson stated that he and Bowles met at the diner on the scheduled day, but Webster canceled. Robertson testified that he was present when Bowles spoke with Webster on the telephone and recalls that Webster canceled because he was required to attend a funeral. Webster denies that a meeting was ever scheduled with Robertson and steadfastly maintains that he had no knowledge of any criminal investigations. The evidence would provide a reasonable fact finder with a basis to reject Webster's denial. Furthermore, Webster undermines his own position regarding his lack of knowledge of the Attorney General's investigation and Bowles' cooperation with it by claiming his support and encouragement of Bowles' investigation into the activities of the employees for whom he was responsible.

Based on the numerous inconsistencies in Webster's testimony, and the lack of evidence corroborating Webster's claims that Bowles was grossly incompetent, unable to control his personnel, and incapable of managing the Public Works Department consistent with Webster's wishes, a reasonable fact finder would be well-justified in disbelieving Webster's proferred reasons for firing Bowles and drawing an inference of pretext. Therefore, plaintiff has successfully demonstrated pretext for the purposes of surviving summary judgment on his CEPA claim.

### E. Mixed Motives Case

In addition to finding that summary judgment is improper under a pretext theory, we also find that summary judgment is improper under a mixed-motives theory. Although we make no finding based on the present record as to whether there is sufficient direct evidence of discriminatory animus in the instant case, we note that plaintiff is entitled to proceed under both theories at trial and that a district judge need not make the determination of whether to classify a case as a pretext or mixed-motive case until he feels he has been presented with all of the relevant evidence. *See Armbruster v. Unisys Corp.*, 32 F.3d 768, 781 (3d Cir.1994). Thus, we need not decide under which theory this case will ultimately be decided because we are denying defendant's motion for summary judgment and allowing the parties to proceed to trial.

We nonetheless point out that Webster's alleged reasons for firing Bowles are so closely related to the protected activities in which Bowles was engaged, that certain facts, if proven true, may "directly reflect a discriminatory or retaliatory animus on the part of Webster." [3] *Armbruster*, 32 F.3d at 778. For example, Webster's complaints that Bowles did not exhibit proper management skills and lacked control over his per-

---

**3.** There is some confusion among courts as to exactly what type of evidence is required to allow a plaintiff to proceed under a mixed-motives theory. Some courts describe the evidence necessary as "direct" while others use the term "overt." *See Armbruster*, 32 F.3d at 779; *Griffiths*, 988 F.2d at 470; *Ostrowski*, 968 F.2d at 181–82 (ADEA case suggesting word "direct"

may not be a precisely accurate modifier). The Third Circuit appears to require that, whether labelled as direct evidence or overt evidence, to come within the mixed-motives framework, evidence "must directly reflect a discriminatory or retaliatory animus on the part of the person involved in the decisionmaking process." *Armbruster*, 32 F.3d at 778.

sonnel may have there genesis in Bowles' refusal to violate the instructions of the Attorney General by moving personnel around. The record suggests that Bowles refrained from taking action to address certain situations in the department because they were the subject of Robertson's criminal investigation and he was told not to interfere. Bowles testified that he informed Webster of his reasons for refraining from taking personnel action. If Webster knew Bowles' compliance with the investigation precluded him from addressing certain problems and then fired him because of "management differences," "gross incompetence" or "lack of control over personnel" directly stemming from Bowles' inability to both address these problems and comply with the Attorney General's directives, a jury might find this "overt" evidence "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Armbruster*, 32 F.3d at 778. If this is true, defendants will have difficulty bearing the burden of proving that Webster did not "place[] substantial negative reliance on an illegitimate criterion in reaching [his] decision," *Price Waterhouse*, 490 U.S. at 277 (O'Connor.J. concurring), and plaintiff may prevail on a mixed-motives theory.

### F. Violation of 42 U.S.C. § 1983 Based on Exercise of First Amendment

■ Bowles alleges that Webster terminated him for exercising his First Amendment rights to free speech in violation of 42 U.S.C. § 1983. Section 1983 provides a civil remedy against those who, under color of state law, deprive others of their constitutional rights. To prove a claim of retaliation for having engaged in free speech protected by the First Amendment, a plaintiff must first show that his speech constituted protected activity. *See Feldman v. Philadelphia Housing Auth.*, 43 F.3d 823, 829 (3d Cir.1994); *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993). Plaintiff must then demonstrate that his protected activity was a substantial or motivating factor in the alleged retaliation. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977);

*Green v. Philadelphia Housing Auth.*, 105 F.3d 882, 885 (3d Cir.1997); *Feldman*, 43 F.3d at 829; *Holder*, 987 F.2d at 194. To defeat plaintiff's claim, defendants must prove they would have acted no differently in the absence of plaintiff's protected conduct. *See Feldman*, 43 F.3d at 829; *Holder*, 987 F.2d at 194.

■ In our April 17, 1997 Opinion denying defendants' motion to dismiss, we found that plaintiff's statements to Webster, Keating and Robertson about the ongoing Attorney General's investigation constituted free speech protected by the First Amendment. *See Bowles v. City of Camden et al.*, No. 96–4907, Slip Op. at 6 (D.N.J. April 17, 1997). As we noted, the Supreme Court has held that "[s]tatements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Bowles' statements involved matters of public concern and are therefore protected. Defendants have not presented any arguments which challenge our finding that Bowles' statements were protected. Thus, we now turn to an analysis of whether Bowles' cooperation in the investigation was a substantial or motivating factor in Webster's decision to terminate him. *Mt. Healthy*, 429 U.S. at 287.

■ Based on our analysis of plaintiff's CEPA claim, *see supra* at pp. 18–22, we find that there is a genuine issue of fact as to whether Bowles' cooperation with the Attorney General was a substantial or motivating factor in Webster's decision to fire him. Because we feel the analyses required for a CEPA retaliatory discharge claim and a § 1983 First Amendment retaliation claim are so similar, we need not revisit our reasons for questioning Webster's motivation for terminating Bowles here. Instead, we rely on our CEPA analysis for our conclusion that Webster has not provided sufficient evidence to demonstrate that his actions were taken for a valid, non-retaliatory reason. Thus, we will deny the City and Webster's motion for

summary judgment on plaintiff's § 1983 claim.

### G. Liability of Keating and Named City Council Members Under § 1983 and CEPA

As defendants correctly point out, in order for defendants to be liable under § 1983 in their individual capacity, they must have caused the deprivation of a federal right. *See Kentucky v. Graham*, 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Here, neither Keating nor members of the City Council terminated Bowles themselves. Only Webster can be held directly responsible for Bowles' termination. Nonetheless, city actors who are indirectly involved in a deprivation of rights may be liable for a § 1983 violation under certain limited circumstances.

In *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Supreme Court reviewed several guiding principles governing when a decision on a single occasion may be enough to establish an unconstitutional municipal policy and which city officials may be held liable for it. *Praprotnik* held that § 1983 liability exists only for acts "which the municipality has officially sanctioned or ordered." *Id.* 485 U.S. at 123. Only those municipal officials who have "final policymaking authority" may be liable. *Praprotnik* also held that whether a particular official has "final policymaking authority" is a question of state law. *Id.* For liability to lie, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business. *Id. See generally Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

Thus, in order to determine whether or not Keating and the individual City Council members may be liable for Bowles' termination, we must decide whether, under New Jersey law, Keating or any of the City Council members had final policymaking power with respect to the termination of department heads, and if any of them did have final policymaking power, whether Webster termi-

nated Bowles pursuant to policies they adopted.

Under New Jersey law:

*The mayor* [of the City of Camden] may in his discretion remove any department head ... after a notice and opportunity to be heard. Prior to removal the mayor shall first file written notice of his intention with the council, and such removal shall become effective on the twentieth day after the filing of such notice unless the council shall prior thereto have adopted a resolution by a two-thirds vote of the whole number of the council, disapproving the removal.

N.J.S.A. 40:69A–43(c) (emphasis added).

Keating, whose only function with the City was as Business Administrator, had absolutely no authority with regard to the removal of the Mayor's department heads. In fact, under New Jersey law, he had no official involvement at all with the Mayor's removal decisions. Furthermore, the record reveals little, if any, evidence that Keating had anything to do with Webster's independent decision to fire Bowles. To the contrary, Keating appears to have had few concerns with Bowles' performance, stating that he was no worse than any of his predecessors, and does not recall any discussions at weekly staff meetings where Bowles' alleged deficiencies were discussed. It is abundantly clear that under *Praprotnik*, the city could not be held liable for any actions taken by Keating because Keating did not have final policymaking authority with regard to the termination of department heads. Any involvement, and we question whether any existed, Keating may have had in the Mayor's decision to terminate Bowles would be outside the scope of his official duties. "Simply going along with discretionary decisions" is not enough for liability. *Praprotnik*, 485 U.S. at 130. Thus, we feel it would be completely inconsistent with the principles of *Praprotnik* to hold Keating individually liable under § 1983 for the actions of his superior, Mayor Webster, when Keating had no authority under state law to influence the Mayor's decision or make policies impacting upon the Mayor's ability to terminate Bowles.

■ Similarly, we find that there is simply no sufficient evidence of Keating's involvement in Webster's decision to terminate Bowles to support plaintiff's CEPA claim against Keating. Without any evidence from which a reasonable inference could be made that Keating was in any way involved in Bowles' termination, we find that plaintiff has failed to demonstrate a prima facie case of retaliation under a pretext theory. We also find that he has failed to give any direct evidence of discriminatory animus or retaliatory motive and therefore cannot support a mixed-motives CEPA claim against Keating. Thus, we hold that Keating is not liable under either CEPA or § 1983 and we will grant summary judgment in his favor and dismiss him from the case.

■ The City Council members, although more involved in the decision to terminate Bowles, also lack the requisite final policymaking authority under New Jersey law to be held individually liable for an alleged § 1983 violation. In *Praprotnik*, the Court explained the type of authority which must exist before § 1983 liability will lie:

> [T]he authority to make municipal policy is necessarily the authority to make final policy.... [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

485 U.S. at 127. Thus, in order to be liable, the City Council members would have had to have had affirmatively ratified Webster's termination decision, making it final by officially approving and adopting the Mayor's decision and his basis for it. This is not the case here.

New Jersey law does not require any affirmative action on the part of the City Council before the Mayor's decision to fire a department head becomes final. In order to become final under New Jersey law, the Mayor's termination decision does not need to be affirmatively adopted by the full body as the official policy of the council. To the contrary, the Mayor's decision is the final official policy *unless* two-thirds of the council pass a resolution *disapproving* the Mayor's decision to terminate a department head. See N.J.S.A. 40:69A–43(c). Thus, the City Council members were involved in Bowles' termination only so far as two-thirds of the council failed to take action to pass a resolution disapproving the Mayor's decision. We cannot find that such passivity and inaction constitute affirmative ratification and final policymaking action.

As further expounded by the Supreme Court in *Jett v. Dallas Independent School District*, before liability may be imposed, individuals with policymaking authority must have, through their decisions, "caused the deprivation of rights at issue by policies which affirmatively command that it occur...." 491 U.S. 701, 736, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (citation omitted). In essence, *Jett* requires the plaintiff to adduce "scienter-like evidence" before decisions by a policymaking body may subject its members to § 1983 liability. *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1062 (3d Cir. 1991). Here, there is simply no "scienter-like evidence" that, by not disapproving the Mayor's termination decision by a two-thirds vote, the City Council members "caused [Bowles'] deprivation of rights ... by policies which affirmatively command that it occur." Therefore, they are not liable under § 1983.

■ We also find that they are not liable under CEPA. In discrimination cases, employers have traditionally been held responsible for the improper actions of their supervisory employees. *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 619, 626 A.2d 445 (1993) (citing Restatement (Second) of Agency, Sec. 219); *see also Fuchilla v. Layman*, 109 N.J. 319, 537 A.2d 652, *cert. denied sub nom., University of Medicine & Dentistry v. Fuchilla*, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Under the traditional respondeat superior theory, in order for the City Council members to be liable for Webster's decision to fire Bowles, they would have to have recommended that Bowles be fired, or at the very least, affirmatively approved Bowles' termination. *See Abbamont*

*v. Piscataway Tp. Bd. of Educ.,* 269 N.J.Super. 11, 28, 634 A.2d 538, 546 (N.J.Super.A.D.1993). Because we find that the failure of two-thirds of the council to disapprove Webster' termination decision does not rise to the level of an affirmative recommendation of that decision, we hold that the City Council members are not vicariously liable for Webster's actions under CEPA.

Therefore, we find that the individual City Council members are not liable under either § 1983 or CEPA and we will grant summary judgment in their favor and dismiss them from the case.

### H.  *Additional State Causes of Action*

Because we have denied the City's and Webster's motion for summary judgment on plaintiff's federal question claim under § 1983 and the First Amendment, we will retain pendent jurisdiction over his state claims against the City and Webster for defamation and his N.J.S.A. 40:69A–43(c) claim for termination without a hearing. *See* 28 U.S.C. § 1367.

### III.  CONCLUSION

For the foregoing reasons, this Court will deny the City's and Webster's motion for summary judgment on plaintiff's CEPA and § 1983 claims, retain pendent jurisdiction over plaintiff's state clams, and allow this case to proceed to trial. We will grant, however, Keating's and the City Council members' motion for summary judgment on plaintiff's CEPA and § 1983 claims and will therefore dismiss them from the case.