Thomas SCHLICHTIG and Mary
Lou Schlichtig, Plaintiffs,

v.

INACOM CORPORATION, Defendant.

Civil Action No. 99–1208(SSB).

United States District Court,
D. New Jersey.

July 8, 2003.

**600**

Sally E. Heckeroth, Esq., Alicia A. Zonetti, Fox, Rothschild, O'Brien & Frankel, LLP, Lawrenceville, NJ, for Plaintiffs.

Joseph P. Paranac, Jr., Esq., Elizabeth Wizeman Dollin, Esq., St. John & Wayne, L.L.C., Newark, NJ, for Defendant.

## OPINION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Plaintiff Thomas Schlichtig ("Plaintiff" or "Schlichtig"), and his wife, Mary Lou Schlichtig, originally filed this action in the Superior Court of New Jersey, Law Division, Gloucester County, on January 19, 1999, asserting claims against Plain-

tiff's former employer, Defendant Inacom Corporation, for breach of an implied contract of employment (Count I), breach of the duty of good faith and fair dealing (Count II), "prima facie" tort (Count III), violation of New Jersey's Conscientious Employee Protection Act ("CEPA") (Count IV), defamation (Count V), negligent infliction of emotional distress (Count VI), and loss of consortium (Count VII). Defendant thereafter removed the case to this Court pursuant to 28 U.S.C. § 1446(a), asserting jurisdiction based on 28 U.S.C. § 1332 (diversity of citizenship). In an Opinion and Order dated February 22, 2000, the Court denied Defendant's motion to dismiss Plaintiff's CEPA claim, but granted that motion with respect to Plaintiff's claims for "prima facie" tort, defamation, negligent infliction of emotional distress, and loss of consortium, as the pleadings underlying those claims failed "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The Court also granted Defendant's motion to have Plaintiff's demands for punitive damages and counsel fees stricken from the breach of contract claims asserted in the first two counts of his complaint.

Defendant now moves for summary judgment with respect to the three surviving counts of Plaintiff's complaint: Count I (breach of an implied contract of employment), Count II (breach of the duty of good faith and fair dealing), and Count IV (violation of New Jersey's CEPA). For the reasons set forth below, Defendant's motion will be granted with respect to the breach of contract claims asserted in the first two counts of Plaintiff's complaint, and denied with respect to Plaintiff's CEPA claim (Count IV).

## I. FACTUAL AND PROCEDURAL BACKGROUND

In early December 1997, Schlichtig, then a detective with the New Jersey State

Police, filled out an employment application for a position as a Loss Prevention Specialist at Inacom's Swedesboro, New Jersey facility. (Def.'s Rule 56.1 Stmt. of Undisp. Mat. Facts at ¶ 1). That application contained the following disclaimer located just above the signature line:

APPLICANT: PLEASE READ THOROUGHLY

. . . .

I understand that if I obtain employment with Inacom, my employment will not be for a fixed period of time and that it can be terminated by Inacom, or me, with or without notice for any reason or no reason, and without liability for wages, salary, or other compensation or benefits except what I have earned as of the date of termination or specified by federal, state, or local law. I understand that no employee, officer, or agent of Inacom may bind the Company to anything contrary to the above by oral or printed statements, including, but not limited to, handbooks, benefit booklets, or other forms of communications.

(*See* Employment Application dated December 15, 1997, attached as Ex. B to the Declaration of Joseph P. Paranac, Jr., Esq.). Plaintiff attended a series of interviews and was offered a position with Inacom on January 23, 1998. (Schlichtig Dep. 11/23/99 at 220:16–19). He immediately accepted the company's offer and executed a contract of employment that same day. (*Id.* at 221:5–17; Def.'s Rule 56.1 Stmt. at ¶ 6). That employment agreement, like the disclaimer set forth in Schlichtig's employment application, expressly reserved Inacom's right to terminate his employment "with or without cause or notice at any time." (Employment Agreement dated January 23, 1998, attached as Ex. C to Paranac Decl.). The contract further provided that its terms and conditions constituted the "whole agreement of the parties relevant to" Schlichtig's employment and

that any future modification of those terms and conditions would have to be "in writing" and "executed by both parties." (*Id.*).

Before beginning his employment with Inacom on February 9, 1998, Schlichtig asked Karen Bishop, the Swedesboro facility's human resources manager, to provide him with the names and social security numbers of several Inacom employees. (Bishop Dep. 11/3/99 at 106:13–18, attached as Ex. E to the Declaration of Sally E. Heckeroth, Esq.; Schlichtig Dep. 11/23/99 at 45:22–46:15). After receiving this information, Schlichtig proceeded to run "record checks" on each of these individuals. (Schlichtig Dep. 11/23 at 45:9–21). At his deposition, Schlichtig explained that he had been told during his interviews that Inacom was experiencing as much as $6 million a year in losses due to computer theft and thought it might be beneficial to take advantage of some of the resources available to him by virtue of his position with the State Police to run background checks on some of the facility's employees to "see what we had there." (Schlichtig 11/23 Dep. at 45:24–46:10; 49:1–7). These record checks turned up 25 employees with criminal records. (McKeever Dep. at 281:16–21). On February 10th, Schlichtig's second day of work, he showed the results of these background checks to the director of the Swedesboro facility, Helmut Kalman, who then "immediately" told Mark Ross, Schlichtig's supervisor, about the record checks. (Schlichtig Dep. 11/23 at 24:12–17; Kalman Dep. at 69:10–20, attached as Ex. F to Heckeroth Decl.). After reviewing the results of the background checks, Kalman told Schlichtig he had "carte blanche" to examine the company's personnel files and requested that he conduct similar background checks for all new Inacom hires. (Schlichtig Dep. 11/23 at 24:12–25:10).

Sometime between March 11 and March 21st, an incident occurred in which one of the company's employees was found in possession of marijuana while entering through a security gate at the entrance to the Swedesboro facility. (Ross Dep. at 113:15–25). Schlichtig advised Ross of the situation and recommended that Inacom report the incident to the local police department. (Ross Dep. at 113:15–114:11). According to Kelly McKeever, the facility's director of human resources, Ross "instructed" Schlichtig that there was no reason to get the police involved because Inacom planned to terminate the employee for violating its strict drug and alcohol policy and did not intend on pressing any charges. (McKeever Dep. at 100:20–101:19; 103:21–24). Nevertheless, over Ross's objection, Schlichtig reported the incident to the Logan Township Police Department and invited the department's officers to come to the facility to take possession of the marijuana. (*Id.* at 100:13–102:24). On March 26, 1998, approximately five to fifteen days later, Ross informed Schlichtig that he was being terminated for, among other things, getting the police involved in the "marijuana incident." (McKeever Dep. at 100:13–103:24; 276:25–279:14; Schlichtig's 12/6/99 Dep. at 117:21–118:5; 118:7–19; 158:5–7; 174:18–22; 183:24–184:6; Ross Dep. at 113:15–25).

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

■ The standard for granting a motion for summary judgment is a stringent one, though it is not insurmountable. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted only when the evidence contained in the record, including "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.* 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there are any disputed issues of material fact which must be reserved for trial, the court must view the record in the light most favorable to the non-moving party, together with all reasonable inferences which can be drawn therefrom. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, relevant Supreme Court decisions mandate that a summary judgment motion be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict in favor of the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). In other words, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, if the non-movant's evidence on any essential element of the claims asserted is merely "colorable" or is "not significantly probative," the court must enter summary judgment in favor of the moving party.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991) (observing that non-movant's effort to defeat summary judgment may not "rest upon mere allegations, general denials, or . . . vague statements").

## III. DISCUSSION AND ANALYSIS

### A. Count I: Breach of Implied Contract of Employment

■ In New Jersey, as in most other states, absent an agreement to the contrary, the relationship between an employer and its employees is presumed to be for an indefinite period and terminable at the will of either party—that is, except in certain limited instances where an employee's termination is statutorily proscribed or contrary to a clear mandate of public policy. *See Witkowski v. Thomas J. Lipton,* 136 N.J. 385, 397–398, 643 A.2d 546 (1994); *see also D'Agostino v. Johnson & Johnson, Inc.,* 133 N.J. 516, 527, 628 A.2d 305 (1993). In an employment relationship of this nature, an employer is ordinarily free to discharge an employee at any time, with or without notice, and for any reason whatsoever or even no reason at all. *See Witkowski,* 136 N.J. at 397, 643 A.2d 546. However, New Jersey courts have generally exhibited a greater willingness than the courts of most other jurisdictions to recognize a cause of action for breach of contract against employers who fail to honor the express or implied promises made in an employee manual or handbook. *See Woolley v. Hoffmann–La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257, *modified,* 101 N.J. 10, 499 A.2d 515 (1985); *see also Nicosia v. Wakefern Food Corporation,* 136 N.J. 401, 643 A.2d 554 (1994).

In *Woolley,* the seminal decision in this area, the New Jersey Supreme Court held that "when an employer of a substantial number of employees circulates a manual that, when fairly read, provides that certain benefits are an incident of the employment (including, especially, job security provisions), the judiciary, instead of 'grudgingly' conceding the enforceability of those provisions . . . should construe them in accordance with the reasonable expectations of the employees." 99 N.J. at 297–98, 491 A.2d 1257. In applying this "reasonable expectations" test to the facts of that case, the Court found it particularly significant that Woolley, like most of his co-workers, had been employed "without any individual employment contract" explicitly setting forth the terms and conditions of his employment. 99 N.J. at 299, 491 A.2d 1257. Under the circumstances, the Court observed, it was "almost inevitable" that Woolley, having been "given this one document [the employee manual] that purports to set forth the terms and conditions of his employment," would "regard it as a binding commitment, legally enforceable, concerning the terms and conditions of his employment." *Id.* The Court observed that an employer wishing to avoid making any binding contractual commitments could very simply accomplish this task by including "in a very prominent position an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause." *Id.* at 309, 491 A.2d 1257.

■ In attempting to ascertain "whether an employee may reasonably understand that an employment manual is intended to provide enforceable employment obligations," the New Jersey courts have typically considered such factors as the

"definiteness and comprehensiveness" of the manual's termination policies and progressive disciplinary procedures and the context of it's preparation and distribution. *Witkowski*, 136 N.J. at 393, 643 A.2d 546; *Nicosia*, 136 N.J. at 408–409, 643 A.2d 554. Thus, under *Woolley* and its progeny, an employment manual or handbook which is "widely disseminated" to a substantial portion of a company's workforce, fairly "definite and comprehensive in its terms," and "contains no clear and prominent disclaimer" expressly reserving the employer's right to terminate its employees at any time, with or without prior notice, and for any reason or no reason at all, may reasonably be construed as "a unilateral offer to contract that an employee may accept through continued employment." *Witkowski*, 136 N.J. at 399, 643 A.2d 546.

■ The *Woolley* doctrine does have its limits, however. For instance, as the Appellate Division observed in *Ware v. Prudential Insurance Company*, the basic principles articulated in *Woolley* do not extend to situations in which an "employee has an individual written employment contract which expressly states that his employment is at will." 220 N.J.Super. 135, 142–143, 531 A.2d 757 (App.Div.1987) (rejecting breach of contract claim based on implied promises allegedly contained in employment handbook where the undisputed facts established that plaintiff had signed an individual employment contract with his employer which, by its terms, could "be terminated by either party at any time"). As the court explained:

> The Court in *Woolley* [ ] emphasized that a company's general personnel practices embodied in a policy manual do not automatically become legally binding terms and conditions of employment. To avoid this consequence, "[a]ll that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; ... and that the employer continues to have the absolute power to fire anyone with or without good cause." 99 N.J. at 309, 491 A.2d 1257. Since an employer may avoid any legally binding effect being given to personnel policies set forth in a policy manual by a unilateral statement in the manual, it follows *a fortiori* that *this effect may be avoided by the execution of a written employment contract by which the employee expressly agrees to an at will employment status.*

*Id.* at 144, 531 A.2d 757. (emphasis added); *see also D'Alessandro v. Variable Annuity Life Insurance Company*, 1990 WL 191914 at *5 (D.N.J.1990) (Fisher, J.) (holding that certain "standard practice memoranda" which employer had distributed to plaintiff and its other employees did not create "an implied contract that [plaintiff's] employment [could] be terminated only for cause" because plaintiff had entered into a separate written employment contract which, by its express terms, could "be terminated by either party for any reason"). The Appellate Division's holding is consistent with the principles set forth in *Woolley* and simply re-affirms a fundamental tenet of contract law: where an employee has executed a separate written contract in which he has expressly agreed that his employment can be terminated "at will," it is that agreement, and not the disciplinary policies and termination procedures of his employer's policy manual or handbook, which establishes the employee's "reasonable expectations" concerning the nature of his employment relationship. *See D'Alessandro*, 1990 WL 191914 at *5 (observing that the basic principle underlying the holding in *Woolley* is the "notion that the circulation of materials containing job security provisions should be construed in accordance with the reasonable expectations of the employees. Where an employ-

ee has an individual contract providing for termination by either party at anytime it is hard to conceive that her reasonable expectations would lead her to believe subsequently distributed materials would alter these terms.").

■ In the instant case, the undisputed facts in the summary judgment record establish that Schlichtig entered into an individual written employment contract with Defendant Inacom which expressly stated that his employment could be "terminated with or without cause or notice at any time." (*See* Def.'s Rule 56.1 Stmt. of Undisp. Mat. Facts at ¶ 6; Pl.'s Response to Def.'s Stmt. of Undisp. Mat. Facts at ¶ 6). Accordingly, it follows, as a matter of law, that Schlichtig could not have had a "reasonable expectation" that the termination policies and progressive disciplinary procedures set forth in Inacom's Policies and Procedures Manual had the effect of altering his status as an "at will" employee and restricting the company's authority to discharge him "at any time" and "with or without cause."

The Third Circuit Court of Appeals' decision in *Radwan v. Beecham* also dictates dismissal of Plaintiff's *Woolley* claim. 850 F.2d 147 (3d Cir.1988). The plaintiff in *Radwan* received an employment manual shortly after beginning his employment with the defendant which contained a section entitled "Dismissal" and listed six categories of misconduct which would constitute grounds for immediate termination. *Id.* at 149. The manual also failed to include a disclaimer reserving the employer's right to terminate its employees at any time, with or without a reason or notice. *Id.* at 150.

The plaintiff, relying on the principles set forth in *Woolley* and its progeny, argued that the provisions of this manual constituted binding contractual commitments which effectively modified his status as an "at-will" employee and limited his

employer's ability to terminate him without "just cause." *Id.* at 149. However, the Court of Appeals rejected this argument. In doing so, the Court pointed to the language of an employment application which the plaintiff had read, completed, and signed shortly before beginning his employment with the defendant. The relevant text of that employment application provided as follows:

> I authorize investigation of all statements contained in this application. I understand that misrepresentation of facts called for is cause for dismissal. Further, *I understand and agree that my employment is for no definite period and may, regardless of the date of payment of my wages and salary, be terminated at any time without previous notice.*

*Id.* at 148–149 (emphasis added). The Court held that this language effectively foreclosed the plaintiff's argument that the termination provisions and progressive disciplinary procedures set forth in the defendant's employee manual granted him the right to be discharged only for cause:

> Here, unlike in *Woolley*, the question of the employee's tenure was specifically dealt with in writing when he was hired, for Radwan in his employment application agreed that he could be discharged at any time without previous notice. *See* 99 N.J. at 285, 491 A.2d 1257. Further, nothing in Radwan's application suggested that Beecham's right to discharge him was dependent on his conduct or job performance. While this application was not part of the employees manual, we do not understand *Woolley* to require that disclaimers of an intent to bind an employer not to discharge an employee must be in the employees manual and not in an individual agreement ... *In view of Radwan's acceptance of a term of employment providing without quali-*

*fication that he could be terminated at any time without previous notice, he could hardly have any reasonable expectation that Beecham's manual granted him the right only to be discharged for cause.*

*Id.* at 150 (emphasis added). Judge Barry, employing the reasoning of the *Radwan* Court, reached a similar conclusion in *McDermott v. Chilton Company,* 938 F.Supp. 240 (D.N.J.1995). In *McDermott,* the plaintiff had signed an employment application which contained the following language:

> I understand that in the event I am hired, and in the absence of a written agreement to the contrary, my status will be that of an employee at will, with no contractual right, express or implied, to remain in the Company's employ. *I specifically agree that my employment may be terminated, with or without cause or notice, at any time at the option of either the Company or myself.* I understand that no unauthorized representative may enter any agreement for employment or make any agreement contrary to the foregoing.

*Id.* at 245 (emphasis added). The plaintiff had also completed and signed another document on his first day of work entitled "Post Employment Personal Summary" which contained similar language confirming his status as an "at will" employee. *Id.* Judge Barry concluded that because the language contained in these two documents "unmistakably evidenced an agreement that was terminable at will," the plaintiff could not " 'have [had] any reasonable expectation that [the provisions of his employee] manual granted him the right only to be discharged for cause.' " *Id.* (quoting *Radwan,* 850 F.2d at 150). The court therefore held that, under *Radwan,* plaintiff's breach of contract claim failed as a matter of law. *Id.* at 245–46.

The facts of this case are indistinguishable from those presented in *Radwan* and *McDermott.* The undisputed facts in the summary judgment record establish that, prior to commencing his employment with Inacom, Schlichtig completed and signed an employment application which, like the applications at issue in *Radwan* and *McDermott,* explicitly stated, in clear and unequivocal terms, that his employment would "not be for a fixed period of time" and could be "terminated by Inacom ... with or without notice for any reason or no reason ...". (See Paranac Decl., Ex. B). Indeed, the language of the disclaimer, which was printed just above the signature line on the application, went even further, warning Schlichtig that "no employee, officer, or agent of Inacom" could modify the "at-will" nature of his employment "by oral or printed statements, *including, but not limited to, handbooks, benefit booklets,* or other forms of communications." (*Id.*) (emphasis added). Thus, here, as in *Radwan* and *McDermott,* any questions regarding the nature of Schlichtig's employment relationship with Inacom were explicitly dealt with in writing even before he began his employment. Accordingly, the *Woolley* claim set forth in Count I of Schlichtig's complaint necessarily fails as a matter of law.

## B. Count II: Breach of the Duty of Good Faith and Fair Dealing

█ Schlichtig contends that his termination constituted a breach of the implied duty of good faith and fair dealing arising out of the binding contractual commitments set forth in Inacom's Policies and Procedures Manual. (Pl.'s Opp. Br. at 14). However, because the Court has concluded that the terms of this employee manual could not have given rise to an implied contract of employment, it necessarily follows that the manual's provisions do not contain an implied covenant of good faith

and fair dealing. *See, e.g., Noye v. Hoffmann–La Roche, Inc.,* 238 N.J.Super. 430, 433, 570 A.2d 12 (App.Div.1990) (holding that in the absence of a contract of employment, whether express or implied, there is no implied covenant of good faith and fair dealing); *see also Barone v. Leukemia Society of America,* 42 F.Supp.2d 452, 457 (D.N.J.1998) (Irenas, J.) ("In the absence of a contract, there is no implied covenant of good faith and fair dealing which might be used as a basis for finding a right to continued employment.").

This case is somewhat unusual in that Schlichtig's employment was governed by a written employment agreement which expressly confirmed the "at-will" nature of his employment relationship with Inacom. Nevertheless, while some New Jersey courts have suggested that the doctrine of good faith and fair dealing may attach to aspects of the at-will employment relationship "governing issues other than the duration of the relationship," *see Bishop v. Okidata, Inc.,* 864 F.Supp. 416, 426 (D.N.J. 1994) (Irenas, J.) (citing *Nolan v. Control Data Corp.,* 243 N.J.Super. 420, 579 A.2d 1252 (App.Div.1990)); *see also Bonczek v. Carter–Wallace, Inc.,* 304 N.J.Super. 593, 599, 701 A.2d 742 (App.Div.1997); *Peck v. Imedia, Inc.,* 293 N.J.Super. 151, 168, 679 A.2d 745 (App.Div.1996), "none of these cases hold that an employer's obligation to act in good faith imposes on the employer a contractual obligation to provide continued employment or to fire only for good cause." *Barone,* 42 F.Supp.2d at 458. Accordingly, even were the Court to conclude that the terms of Schlichtig's written employment contract gave rise to an implied covenant of good faith and fair dealing, there is no evidence that such a covenant was breached in this case. Accordingly, the Court will grant summary judgment with respect to Count II of Schlichtig's complaint.

## C. Count IV: CEPA Violation

Defendant Inacom also moves for summary judgment with respect to the CEPA claim contained in Count IV of Plaintiff's complaint. The Conscientious Employee Protection Act, N.J.S.A. 34:19–1 *et. seq.,* or "CEPA," was enacted by the state's legislature in 1986 to "protect employees who report illegal or unethical work-place activities" from retaliation by their employers. *Higgins v. Pascack Valley Hospital,* 158 N.J. 404, 417, 730 A.2d 327 (quoting *Barratt v. Cushman & Wakefield,* 144 N.J. 120, 127, 675 A.2d 1094 (1996)). The statute both codifies and expands the common law cause of action, first recognized in *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 72, 417 A.2d 505 (1980), which "protects at-will employees who have been discharged in violation of a clear mandate of public policy," *Higgins,* 158 N.J. at 417–418, 730 A.2d 327; *see also Mehlman v. Mobil Oil Corp.,* 153 N.J. 163, 180, 707 A.2d 1000 (1998) (observing that CEPA "elaborates on and derives from the common law cause of action for wrongful discharge first recognized in [*Ortho*]."), and, thus, "establishes a statutory exception to the general rule that an employer may terminate an at will employee with or without cause." *Higgins,* 158 N.J. at 418, 730 A.2d 327.

N.J.S.A. 34:19–3, which defines the types of employee conduct entitled to protection under CEPA, prohibits "an employer" from taking "retaliatory action" against an employee who:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law; or

b. Provides information to, or testifies before, any public body conducting

an investigation, hearing or inquiry into any violation of a law, or a rule or regulation promulgated pursuant to law by the employer; or

 c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

 (1) is in violation of a law, or rule or regulation promulgated pursuant to law; or

 (2) is fraudulent or criminal; or

 (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare.

The basic elements of a CEPA retaliatory discharge claim are similar to those required to make out an actionable violation of Title VII's anti-retaliation provisions. *See Bowles v. City of Camden,* 993 F.Supp. 255, 261 (D.N.J.1998) (Irenas, J.). That is, in order to make out an actionable violation of CEPA, plaintiff must prove, by a preponderance of the evidence, that: (1) he engaged in statutorily protected conduct; (2) his employer took "retaliatory action" against him after or contemporaneous with that protected conduct; and (3) a causal connection exists between his protected conduct and his employer's actions. *Id.* at 262. For the reasons set forth below, the Court concludes that the evidence in the record raises genuine issues of material fact with respect to each of these elements and will, therefore, deny Defendant Inacom's motion for summary judgment on Count IV of Plaintiff's complaint.

### i. *Statutorily Protected Activity*

■ Schlichtig alleges that he was wrongfully and unlawfully terminated in retaliation for notifying local law enforcement authorities that one of the employees at Inacom's Swedesboro facility had been found in possession of marijuana. (Pl.'s Opp. Br. at 16). While he has not specifically identified which section of the CEPA statute he intends to invoke, the Court is satisfied that Schlichtig's actions fit comfortably within the ambit of N.J.S.A. 34:19–3(c)(2). That subsection expressly forbids an employer from taking retaliatory action against an employee who "objects to ... any activity ... which [he] reasonably believes" to be either "fraudulent or criminal." *Id.* There can be no doubt that the activity which Schlichtig reported to the local police department-the possession of marijuana—violates the Controlled Dangerous Substances Chapter of the New Jersey Code of Criminal Justice. *See* N.J.S.A. 2C:35–10(3). Moreover, as the state Supreme Court observed in *Higgins,* unlike "subsections 'a' and 'b' [which] limit the statute's application to policies, practices and activities 'of' or 'by' 'the employer,' subsection 'c' contains no such limitation" and, therefore, clearly extends protection to employees who, like Schlichtig, object to or report the misconduct of a co-worker. 158 N.J. at 419, 730 A.2d 327 ("A plain reading of the statute suggests that [subsection c of] the CEPA covers employees who object to the conduct of co-workers."); *see also Gerard v. Camden County Health Services Center,* 348 N.J.Super. 516, 520, 792 A.2d 494 (App. Div.2002) ("CEPA is remedial legislation" which is "designed to protect employees who reasonably believe, and take action consistent therewith, that their employers *or co-employees* [have] engaged in activity that is ... criminal") (citing N.J.S.A. 34:19–3(c)) (emphasis added). Accordingly, the Court has little difficulty concluding that Schlichtig engaged in conduct protected under subsection (c)(2) when he contacted law enforcement authorities to report that one of his co-workers had been found in possession of an illegal drug.[1]

---

**1.** Extending CEPA's protections to employees who, like Schlichtig, refuse to abide by their supervisor's instructions not to report a co-

#### ii. Retaliatory Conduct

■ Schlichtig's termination clearly falls within the type of "retaliatory conduct" CEPA was intended to prohibit. *See* N.J.S.A. 34:19–2(e) (defining "retaliatory conduct" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of his employment"). Moreover, according to the evidence in the record, Mark Ross, Schlichtig's immediate supervisor, terminated him approximately five to fifteen days after reporting the so-called "marijuana incident" to the police. (Ross Dep. at 113:15–114:11). Schlichtig has, therefore, satisfied the second element of a CEPA retaliatory discharge claim.

#### iii. Causation

■ In order to prevail on his CEPA claim, Schlichtig must produce evidence which would permit a reasonable jury to find that it is "more likely than not" that his statutorily protected conduct *i.e.*, reporting his co-worker's possession of marijuana to the local law enforcement authorities-was a "determinative or substantial motivating factor in [Inacom's] decision to terminate his employment" with its Swedesboro facility. *Donofry v. Autotote Systems, Inc.*, 350 N.J.Super. 276, 296, 795 A.2d 260 (App.Div.2001). That is, he must present proof capable of convincing a rational factfinder that his actions in reporting his co-worker's criminal conduct "made a difference" in the decision to discontinue his employment. *Id.* (observing that an alleged victim of unlawful retaliation "need not prove that his whistleblowing activity was the only factor in the decision to fire him."). In proving this causal link, Schlichtig may proceed under either one of two theories: (1) a "mixed motive" theory, or (2) a "pretext" theory. *See Fleming v. Correctional Healthcare Solutions*, 164 N.J. 90, 100, 751 A.2d 1035 (2000); *Donofry*, 350 N.J.Super. at 290, 795 A.2d 260. The distinction between these two approaches essentially turns on the quality of

worker's criminal conduct to local law enforcement authorities is not only consistent with the text of subsection (c)(2), but will also help to advance the statute's broad remedial goals. *See Abbamont v. Piscataway Township Bd. of Educ.*, 138 N.J. 405, 431, 650 A.2d 958 (1994) (observing that CEPA was enacted to provide "broad protections against employer retaliation for employees who act in the public interest" and, as "remedial" legislation, should be "construed liberally to effectuate [this] important social goal"). Indeed, as Justice Stewart Pollock observed in the Court's majority opinion in *Higgins, see* 158 N.J. at 423–24, 730 A.2d 327, the courts of some states, such as Massachusetts and Illinois, have gone so far as to recognize a common law cause of action for wrongful discharge for employees who have been terminated for reporting the suspected criminal activity of a co-worker to the police or some other public authority. *See, e.g., Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 132, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981) (holding that an "at will" employee who was discharged for reporting his co-workers' suspected criminal activity to the police stated an actionable claim for common law wrongful discharge because "public policy favors the exposure of crime"); *Shea v. Emmanuel College*, 425 Mass. 761, 762–63, 682 N.E.2d 1348 (1997) (concluding that an employee who has been fired for reporting suspected criminal activity in her workplace to a supervisor or some public authority can maintain a cause of action for common law wrongful discharge even in situations where the employer would be considered the principal victim of the alleged crime). Without such protection, employees who would otherwise feel compelled to report a co-worker's criminal conduct to the appropriate law enforcement authorities might hesitate to do so out of a concern that calling attention to such activities would invite the retribution of a vindictive employer intent on avoiding any disruption in the workplace or damage to the its reputation in the community. In other words, "reporting a fellow employee's violation [of a criminal statute to the local authorities] ... is not so different from traditional notions of whistleblowing." *Higgins*, 158 N.J. at 421, 730 A.2d 327.

the evidence available to establish the necessary causal link between Schlichtig's protected conduct and his employer's alleged retaliatory action. *See Fleming*, 164 N.J. at 100, 751 A.2d 1035; *Donofry*, 350 N.J.Super. at 290, 795 A.2d 260. For the reasons set forth below, the Court concludes that Schlichtig has produced sufficient evidence to survive summary judgment under either theory.

*Mixed Motive*

 In order to survive summary judgment on a retaliatory discharge claim under a "mixed motive" theory, an employee must produce "direct evidence that an illegitimate criterion was a substantial factor in the decision" to terminate his employment. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276, 109 S.Ct. 1775, 104 L.Ed.2d 268 (O'Connor, J., concurring). "In other words, the evidence must be such that it demonstrates that the 'decisionmakers placed substantial negative reliance on [the employee's statutorily protected conduct] in reaching their decision." *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 513 (3d Cir.1997) (quoting *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775). Evidence of this type is considered "so revealing of [retaliatory] animus that it is unnecessary to rely on any presumption from the *prima facie* case to shift the burden of production" to the employer. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3dCir.1994); *Walden*, 126 F.3d at 512. Consequently, in a mixed motives case, once an employee has produced "direct" evidence that his protected conduct was a substantial factor in the decision to fire him, *both* the burden of production *and* the burden of persuasion (or risk of non-persuasion) on the issue of causation shift to the employer who must "produce evidence sufficient to show that it would have made the same decision even if [the plaintiff's protected conduct] had played no role in the employment decision." *Fleming*, 164

N.J. at 100, 751 A.2d 1035 (quoting *Jackson v. Georgia–Pacific Corp.*, 296 N.J.Super. 1, 18–19, 685 A.2d 1329 (App.Div. 1996)); *Donofry*, 350 N.J.Super. at 291, 795 A.2d 260.

"[S]tray remarks in the workplace, while perhaps probative of [retaliatory] animus, cannot justify requiring an employer to prove that its employment decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself suffice to satisfy [an employee's initial] burden" under the "mixed motives" framework. *Starceski*, 54 F.3d at 1096 (quoting *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775). Rather, to be entitled to a "mixed motives" charge, an employee must come forward with evidence of "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude" and which directly relate to the challenged employment decision. *Bowles*, 993 F.Supp. at 263 (citing *Starceski*, 54 F.3d at 1096). The use of the adjective "direct" to describe the type of evidence required is, however, often misleading, as the Court of Appeals has held that "certain *circumstantial* evidence [may be] sufficient to shift the burden of proof regarding causation, if that evidence can 'fairly be said to directly reflect the alleged unlawful basis' for the [challenged] adverse employment decision." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir.2002) (quoting *Walden*, 126 F.3d at 513) (emphasis added); *see also Hook v. Ernst & Young*, 28 F.3d 366, 374 (3d Cir.1994).

 The record in this case contains "direct" evidence of the sort required to entitle Schlichtig to a "mixed motives" charge and shift the burden of proof on the issue of causation to Defendant Inacom. This evidence comes in the form of testi-

mony from Kelly McKeever, the corporate director of human resources at Inacom's Swedesboro facility. McKeever was present at the meeting on March 26th in which Schlichtig was first advised of his termination. (McKeever Dep. at 276:25–277:25). According to her testimony, at that meeting, Mark Ross, Schlichtig's supervisor and the individual ultimately responsible for his termination, told Schlichtig that he was being discharged for, among other things, getting the police involved in the marijuana incident. (*Id.* at 278:20–279:14).[2] In this regard, McKeever's testimony is consistent with Schlichtig's account of the explanation Ross offered for his termination. (Schlichtig Dep. 12/6/99 at 237:7–19). A reasonable jury could conclude, based on this testimony, that Schlichtig's protected conduct was "more likely than not" a substantial or motivating factor in Ross's decision to fire him. The Court therefore concludes that this evidence is sufficient to preclude summary judgment under a "mixed motives" framework of analysis. *See, e.g., Fakete,* 308 F.3d at 339–340 (reversing district court's grant of summary judgment where plaintiff had produced "direct" evidence that his age was a substantial factor motivating his supervisor's decision to terminate his employment).

*Pretext*

 In a "pretext" case, the more common of the two approaches, an employee's allegations of retaliatory discharge are evaluated under the now familiar three-step burden-shifting framework first articulated in *McDonnell Douglas Corp. v.Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Fleming,* 164 N.J. at 100, 751 A.2d 1035. The *McDonnell Douglas* framework permits the plaintiff to make use of circumstantial or indirect proof to establish that his protected conduct was a substantial or motivating basis for his termination. Indeed, this framework was originally developed to address the practical difficulty which victims of discrimination and unlawful retaliation often experience in producing direct proof of their employer's motives or intentions. *See Bowles,* 993 F.Supp. at 261 (citing *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1071 (3d Cir.1996) (en banc)); *Donofry,* 350 N.J.Super. at 290–93, 795 A.2d 260 (observing that an employer's "state of mind is rarely susceptible of direct proof, but must ordinarily be inferred from the facts ...") (citing Model Jury Charge (Criminal), "State of Mind" (2000)). When proceeding under this framework, the plaintiff bears the initial burden of producing evidence sufficient to establish a *prima facie* case of retaliatory discharge. *See Kolb v. Burns,* 320 N.J.Super. 467, 478, 727 A.2d 525 (App.Div.1999). Once the plaintiff has made a *prima facie* showing of retaliation, the burden of production (but not the burden of persuasion) shifts to the employer who must articulate a legitimate, non-retaliatory reason for its decision to terminate the plaintiff's employment. *See Fleming,* 164 N.J. at 100, 751 A.2d 1035. If the employer satisfies its

---

**2.** Defendant argues that McKeever's testimony concerning Ross's remarks during the March 26th meeting with Schlichtig is "inadmissible hearsay." (Def.'s Reply Br. at 6). However, because Ross's statements with regard to his reasons for terminating Schlichtig's employment are being offered against Defendant Inacom and clearly concern a matter within the scope of his employment, such statements are considered admissions by a party opponent and, thus, do not fall within Rule 801's definition of hearsay. *See* Fed. R.Evid. 801(d)(2) (An out-of-court "statement is not hearsay if ... [t]he statement is offered against a party and is ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship ...").

evidentiary burden, the burden of production shifts back to the plaintiff who must show that the employer's proffered explanation is merely a ruse or pretext for unlawful retaliation. *Id.* Although the burden of production shifts throughout this process, the "burden of proof or risk of non-persuasion, including the burden of proving 'but for' causation or causation in fact, remains [at all times] on the employee." *Id.; see also Donofry,* 350 N.J.Super. at 293–94, 795 A.2d 260.

An employee establishes a *prima facie* case of retaliatory discharge under CEPA if he produces evidence that: (1) he engaged in protected activity; (2) his employer subsequently took adverse action against him; and (3) a causal link exists between his protected activity and his employer's adverse decision. *See Bowles,* 993 F.Supp. at 262 (citing *Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 177 (3d Cir.1997)). The Court has already concluded that the record contains evidence sufficient to raise a genuine issue of material fact with respect to the first two elements of Schlichtig's *prima facie* case. Accordingly, for purposes of determining whether Schlichtig has met his initial burden under *McDonnell Douglas,* the only question left to be resolved is whether the record also supplies *prima facie* evidence of a causal connection between Schlichtig's termination and his protected conduct.

In determining whether a plaintiff has produced *prima facie* evidence of causation, the decisions of our Court of Appeals have generally focused on two indicia: timing and evidence of ongoing antagonism. *See Kachmar,* 109 F.3d at 177; *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920–21 (3d Cir.1997); *Watkins v. Nabisco Biscuit Company,* 224 F.Supp.2d 852, 871 (D.N.J.2002). Although the timing of an employer's adverse employment action will, by itself, rarely provide sufficient *prima facie* evidence of retaliation, the temporal proximity between an employee's termination and his protected activity may permit an inference of causation where the relatively short interval between the two is "unusually suggestive" of retaliation. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir.1997) (observing that temporal proximity alone may suffice to establish a causal connection if the timing of an employer's adverse employment action is "unusually suggestive" of retaliation); *see also Schatzman v. Martin Newark Dealership, Inc.,* 158 F.Supp.2d 392, 403 (D.Del.2001) (noting that "courts are quick to draw an inference of causation" where the alleged retaliation "occurs only a short time after the employer receives notice of an employee's protected activity"); *see, e.g., Jalil v. Avdel Corporation,* 873 F.2d 701, 708 (3d Cir.1989) (finding that record allowed for an inference of causation where less than two days elapsed between the plaintiff's termination and the date his employer was put on notice of his protected activity). In cases where the timing of an employer's adverse action is, by itself, inconclusive, an employee may demonstrate the requisite causal link by producing circumstantial evidence of "ongoing antagonism" or "retaliatory animus" in the intervening period between his protected activity and the adverse action. *See Kachmar,* 109 F.3d at 177; *Woodson,* 109 F.3d at 921.

Timing and proof of antagonism are not, however, the only methods by which a plaintiff can make out a *prima facie* showing of causation. *Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 289 (3d Cir.2001) (noting that a "broad array" of circumstantial evidence may be used to illustrate a potential causal link between a plaintiff's protected activity and an employer's adverse action); *Kachmar,* 109 F.3d at 177 (observing that the "prof-

fered evidence, when looked at as a whole, may suffice to permit a causal inference"). After all, "it is causation, not temporal proximity [or evidence of antagonism], that is an element of the plaintiff's prima facie case, and temporal proximity [or antagonism] merely provide[s] an evidentiary basis from which an inference [of causation] can be drawn." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000) (quoting *Kachmar*, 109 F.3d at 178). Thus, the Court of Appeals has not excluded the possibility that the timing of an employer's action, together with "other types of circumstantial evidence," may also suffice to support an inference of causation. *Farrell*, 206 F.3d at 280–81; *see also Kachmar*, 109 F.3d at 178 (observing that "the element of causation, which necessarily involves an inquiry into the motives of the employer is highly context-specific"). In short, the case law has set forth few limits on the type of evidence which might suffice to establish a prima face showing of causation. *See Farrell*, 206 F.3d at 281 ("[W]e have been willing to explore the record in search of evidence, and our case-law has set forth no limits on what we have been willing to consider."); *see also Schatzman*, 158 F.Supp.2d at 403.

▮ The record in this case, when viewed in the light most favorable to Schlichtig, the non-moving party, contains evidence that Ross, Schlichtig's supervisor, terminated his employment less than two weeks after he reported the "marijuana incident" to the police. (Ross Dep. at 113:15–25). As the Court has previously noted, the record also contains "direct" evidence that Schlichtig's decision to get the police involved in the "marijuana incident" was one of the grounds cited for his termination. (McKeever Dep. at 278:20–279:14; Schlichtig Dep. 12/6/99 at 237:7–19). The Court is satisfied that this testimony, together with the close temporal proximity between Schlichtig's termination and his protected conduct, suffices to establish an inference of causation for purposes of his *prima facie* case.[3]

▮ Having concluded that the evidence in the record suffices to make out a *prima facie* case of retaliation, the Court must now determine whether Inacom has satisfied its burden of production by articulating a legitimate, non-retaliatory reason for Schlichtig's termination. In order to satisfy its "relatively light" burden of production, Inacom need only "introduc[e] evidence which, if taken as true, would permit the conclusion that there was a [nonretaliatory reason for its] unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). The Court is satisfied that Inacom has met its burden in this regard by introducing a declaration signed by Mark Ross, Schlichtig's supervi-

---

**3.** In both its opening brief and its reply brief, Defendant Inacom contends the summary judgment record fails, as a matter of law, to support an inference of causation because "it is *undisputed* that the decision to terminate [Schlichtig] occurred prior to the activity which he characterizes as whistle-blowing." (Def.'s Br. t 24) (emphasis added). However, a cursory review of the record in this case reveals that this fact is far from "undisputed." While Ross insists in his declaration that "the decision to discharge Schlichtig was made prior to the marijuana incident," his deposition testimony suggests otherwise. Ross testified that the "marijuana" incident may have occurred as earlier as March 11, 1998, whereas his decision to terminate Schlichtig's employment was not "ratified by Inacom's management" until March 20th. (Ross Decl. at ¶ 15). Accordingly, when viewed in light most favorable to Schlichtig, Ross's statements indicate that the final decision to terminate Schlichtig's employment was made after the "marijuana incident." Indeed, it appears from the evidence in the record that the final decision to terminate Schlichtig's employment may have been made within days after he reported the "marijuana incident" to the police.

sor, which purports to set forth several grounds for Schlichtig's termination. In this declaration, Ross states that his decision to fire Schlichtig was based on several acts of misconduct. He first accuses Schlichtig of "wrongfully obtain[ing]" the social security numbers of several Inacom employees and then using that "confidential" information to conduct "unauthorized" background checks on those employees. (Ross Decl. at ¶ 11–12). He also alleges that Schlichtig acted improperly by "sign[ing] a contract for the installation of two metal detectors at the Swedesboro" facility "despite having been told that he did not have the authority to enter into contracts on Inacom's behalf." (*Id.* at ¶ 9). Finally, he accuses Schlichtig of compromising the integrity of an internal investigation into the theft of computer parts at the facility by revealing the location of newly installed hidden cameras to "certain employees." (*Id.* at ¶ 8).[4] Ross insists that Schlichtig's decision to report the "marijuana incident" to the police "played no part in his decision to terminate" him. (*Id.* at ¶ 16).

Accordingly, in order to survive summary judgment, Schlichtig must point to "some evidence, [whether] direct or circumstantial, from which a reasonable finder of fact·could reasonably either (1) disbelieve [Ross's] articulated legitimate reasons [for his termination]; or (2) believe that [his protected conduct] was more likely than not a motivating or determinative" factor in his termination. *Fuentes,* 32 F.3d at 764; *Kolb,* 320 N.J.Super. at 479, 727 A.2d 525. "In other words, [Schlichtig], as the nonmoving party, 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Ross's] proffered legitimate reasons for [his deci-

sion] that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer that [he] did not act for [non-retaliatory] reasons.'" *Kolb,* 320 N.J.Super. at 478, 727 A.2d 525 (quoting *Fuentes,* 32 F.3d at 765) (emphasis in original).

■ The summary judgment record before the Court reveals several "inconsistencies" and "weaknesses" in the reasons Inacom has offered for Schlichtig's termination. First, Ross, Schlichtig, and McKeever, the facility's human resources director, have offered inconsistent testimony concerning the purported reasons for Schlichtig's termination. *See Bowles,* 993 F.Supp. at 266 (observing that evidence of inconsistencies in an employer's proffered explanation for an employee's termination can cast doubt on the employer's credibility and support an inference of pretext). As noted above, in his declaration, Ross states that Schlichtig was fired for allegedly conducting unauthorized background checks; disclosing the location of the facility's hidden cameras; and making an unauthorized purchase of two metal detectors. McKeever, on the other hand, testified that Schlichtig was terminated for conducting unauthorized background checks; disclosing information about the facility's hidden video cameras; signing a contract for two metal detectors *when he only had authority to sign for one at half price;* improperly disclosing information about an investigation into an employee suspected of smoking marijuana; reporting the marijuana incident to the local police; and getting the police involved in a separate investigation into a suspected theft at the facility. (McKeever Dep. at 97–104). Schlichtig, for his part, testified that he was told he was being

---

**4.** Schlichtig emphatically denies signing a contract for the installation of metal detectors at the facility. (Schlichtig Cert. at ¶ 3). He also denies ever disclosing confidential information about any of Inacom's ongoing internal investigations. (*Id.* at ¶ 4).

terminated for reporting the marijuana incident to the police; telling another employee that Kalman had seen him smoking marijuana in the bathroom; and failing to keep Ross apprised of his whereabouts and the status of his investigation into "carrier thefts," as well as for certain unspecified "confidentiality issues." (Schlichtig Dep. 12/6 at 117:21–118:16; 174:18–23; 183:24–184:6; 186:6–9; 237:7–19).

Inacom's failure to produce evidence documenting its alleged dissatisfaction with Schlichtig's job performance also tends to support an inference of pretext. *See Bowles,* 993 F.Supp. at 264 (concluding that the conspicuous absence of any documentation corroborating the defendant's alleged dissatisfaction with the plaintiff's work performance offered support for plaintiff's claim that the proffered explanation for his discharge was pretextual). For instance, while Ross testified that he spoke with Schlichtig about his various performance problems on at least three separate occasions and documented each of those conversations in a memorandum to Schlichtig's personnel file, the summary judgment record contains no such documentation. Inacom has also failed to produce any documentation to corroborate its claim that Schlichtig improperly signed off on the purchase of metal detectors for the Swedesboro facility, an allegation which Schlichtig emphatically denies. (Schlichtig Cert. at ¶ 3).

Finally, Schlichtig has testified that when he spoke to Helmut Kalman, the director of the Swedesboro facility, on February 10th, his second day of work, and informed him that he had conducted background checks on some of the facility's employees, Kalman gave him "carte blanche" to examine the company's personnel files and requested that he conduct similar background checks for all new Inacom hires. (Schlichtig Dep. at 11/23 at 24:12–25:19). Moreover, while Kalman testified that Ross was "immediately" informed about the record checks, according to Schlichtig's testimony, Ross did not raise any questions about the propriety of the record checks until March 16, just 10 days before his termination. (Kalman Dep. at 69:13–16; Schlichtig Dep. 11/23 at 1076:16–107:23). The Court is satisfied that a reasonable jury considering the various inconsistencies and weaknesses in the proffered non-retaliatory reasons for Schlichtig's termination, together with the "direct" evidence that Schlichtig's protected conduct served as a basis for his discharge, could conclude that Schlichtig's protected conduct "was more likely than not" a substantial or motivating factor in his termination. Accordingly, the Court must also deny summary judgment on Schlichtig's CEPA retaliation claim under the *McDonnell Douglas* framework.

## IV. CONCLUSION

For the reasons stated above, Defendant Inacom's motion for summary judgment will be will be granted with respect to the breach of contract claims contained in Counts I and II of Plaintiff's complaint, and denied with respect to the statutory CEPA claim contained in Count IV. The Court will enter an appropriate order.