NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3142
_____

GEORGE G. BOCOBO, M.D.,

Appellant

v.

RADIOLOGY CONSULTANTS OF SOUTH JERSEY, P.A., a New Jersey
Professional Corporation; SOUTH JERSEY HEALTH SYSTEM, INC.,
a New Jersey Corporation; PAUL CHASE, D.O.; RADIOLOGY AFFILIATES,
a business entity jointly, severally, and in the alternative;

ALLIANCE RADIOLOGY ASSOCIATES, L.L.C., a business entity,
jointly, severally, and in the alternative
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 02-cv-01697)
District Judge:  Honorable Joseph E. Irenas
_____

Submitted Under Third Circuit LAR 34.1(a)
April 13, 2012

Before:  McKEE, *Chief Judge* and HARDIMAN, *Circuit Judge*
and JONES[*], *District Judge*.

(Filed:  April 17, 2012)

_____

[*]The Honorable C. Darnell Jones, District Judge for the United States District
Court for the Eastern District of Pennsylvania, sitting by designation.

_____

OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

Almost ten years ago, George Bocobo, M.D., brought a congeries of claims against a hospital, its director of radiology, and two radiology physician groups after they denied him participation in an exclusive contract. He appeals the District Court's summary judgment for Defendants on several of those claims. For the reasons explained below, we will affirm.

I

Dr. Bocobo began performing diagnostic radiology services at South Jersey Health System's (SJHS's) Millvale and Bridgeton divisions in 1985. According to Bocobo, he began "complaining" almost immediately about inadequacies in SJHS's policies and practices. In 1993, Bocobo entered into a Business Relationship Agreement and a Shareholder Agreement with Dr. Paul Chase, who then was SJHS's Radiology Department Director, and Drs. Steven Rothfarb and Craig Taylor to form Radiology Consultants of South Jersey, P.A. (RCSJ). Pursuant to an exclusive contract (Exclusive Contract I), RCSJ served as the sole provider of radiology services for SJHS's Millvale and Bridgeton hospitals from 1993 until 2001. Exclusive Contract I provided:

> Should [RCSJ] terminate its relationship with one or more of [its] Physicians, the status of such . . . Physicians, as members of [SJHS's] Medical Staff, and all accompanying privileges, shall terminate automatically and immediately,

2

and such termination shall not be subject to a due process hearing or review by [SJHS's] Medical Staff or Board of Directors.

Bocobo's employment as a radiologist in the RCSJ group was governed by a separate contract (the Employment Contract), which took effect on October 1, 1993, and was set to terminate on September 30, 1995, if either RCSJ or Bocobo gave ninety days' notice. Paragraph two of the Employment Contract further provided:

> In the absence of [such] notice, this Employment Contract shall continue in force with the right of either party to terminate with ninety (90) days' written notice. Notwithstanding the above, this Agreement shall immediately terminate and [Dr. Bocobo] shall cease to be an Employee of [RCSJ] upon the occurrence of any of the following events: . . . (f) upon the dissolution of [RCSJ]; [or] (g) for cause . . . .
>
> In the event of termination pursuant to the above, [Dr. Bocobo] agrees to resign from the Medical Staff of Bridgeton and Millvale Hospitals without the right to due process . . . , such resignation to be effective on the date of termination as set forth above.

During his nearly eight-year employment with RCSJ performing radiology at SJHS hospitals, Bocobo was the subject of several complaints. According to SJHS's files and deposition testimony, Bocobo harassed technologists and secretaries, wasted time, behaved hostilely towards coworkers, demanded personal medical treatment in his office, and boasted about his romantic prowess with female staff. In a certification filed with the District Court, Bocobo challenged the written reports as false and misleading "one-sided anecdotal memos" that should not have been secretly kept by SJHS.[1]

---

[1] Because Bocobo disputes the veracity of the reports maintained by SJHS in a "secret personal file," we will not consider that evidence at the summary judgment stage.

Apart from the disputed complaints in SJHS's files, Chase testified that Bocobo sometimes did not respond to emergency calls. SJHS staff claim that he was routinely inaccessible. Others insist they preferred not to work with Bocobo because he made work less efficient and more difficult. Various hospital staff called Bocobo "self-centered," "standoffish," "perseverative, argumentative and unreasonable." On one occasion, a referring physician was so disappointed with Bocobo's handling of his patient that he "request[ed] that Dr. Bocobo not look at any of [his] patients or read any of the films from [his] patients." Bocobo claims that SJHS and Chase ultimately grew dissatisfied with him not based on his purported misconduct, but rather due to his "vocal patient advoca[cy]" regarding legitimate concerns about hospital policies and practices.

Around December 1998, in anticipation of its construction of a regional medical center, SJHS began entertaining plans to select one radiology group to service its three area hospitals: Bridgeton and Millvale, for which RCSJ then served as the exclusive radiology group, and Newcomb, for which Vineland Radiology Association (Vineland) provided exclusive radiology services at the time. An update to Exclusive Contract I between RCSJ and SJHS provided that the contract would end in January 2000 and could be terminated with notice any time after January 1999. Accordingly, beginning in January 2001, SJHS's exclusive contract with RCSJ proceeded on a month-to-month basis. In soliciting proposals for a new exclusive radiology provider, SJHS recommended that Chase and Dr. Ernesto Go, the head of Vineland, jointly bid for the contract. SJHS's

President and CEO believed the radiology departments would be less disrupted in the transition to a single site if the existing radiology chiefs collaborated. Chase and Go made a presentation to SJHS on behalf of a planned consolidated group to be called Alliance Radiology. A different group, Booth Radiology, won the exclusive contract, but when Booth unexpectedly declined the contract, SJHS offered it to Alliance. Alliance was officially formed in March 2001, and it contracted with SJHS to become the exclusive provider of radiology services at all three of SJHS's hospitals in Cumberland County (Exclusive Contract II).

Bocobo was excluded from the new group. On April 12, 2001, RCSJ's legal counsel gave Bocobo ninety days' notice that he was being terminated pursuant to paragraph two of the Employment Contract. According to Chase, Bocobo was not invited to join Alliance because he was "cantankerous [and] . . . uncooperative . . . [and] wouldn't conform to decisions . . . made [by] the group." Rothfarb and Taylor likewise testified that Bocobo was excluded because his colleagues at RCSJ "did not wish to associate with him further" and because "he was disruptive, he was not a team player, [and] he had difficult relations with referring physicians, and [did not] accomodat[e] the referring physicians' requests."

At his deposition, Bocobo offered "no opinion as to why" RCSJ terminated him. Nevertheless, he now claims that SJHS played a substantial role in his exclusion from Alliance. Bocobo asserts that Chase's decisions for RCSJ were motivated primarily by

5

his concern for maintaining RCSJ's exclusive contract with SJHS.  Bocobo points to testimony by SJHS's Vice President of Medical Affairs, Dr. Joseph Zeccardi, indicating that Zeccardi mentioned to Chase a situation in which Zeccardi previously "had a similar responsibility of dissolving one group and forming another and hav[ing] a member of [the] group that [he] did not . . . want[] to hire."  Bocobo claims further that because not inviting him to the Alliance group left only five radiologists, one short of the minimum acceptable number under Exclusive Contract II, Chase obtained SJHS's consent before excluding Bocobo.  In support of this claim, Bocobo cites testimony indicating that Chase "spoke to administration" before Alliance was created and that "administration supported Dr. Chase['s] . . . actions and decisions."  Bocobo argues that "SJHS authorized Chase to terminate [his] employment and his medical staff privileges, so that SJHS, as a 50% shareholder in RCSJ's outpatient radiology business, could reap [his] interests in RCSJ." To the contrary, both RCSJ's legal counsel and SJHS's President and CEO, who recommended the merger of RCSJ and Vineland, claim they had "no discussion . . . whatsoever" regarding what might happen to Bocobo when Alliance was formed.

Within two weeks of his termination, Bocobo was hired as a radiologist by a University of Pennsylvania hospital that is closer to his Villanova home than to SJHS's Millvale or Bridgeton locations.  His starting annual salary ($190,000) was $20,000 less than his salary with RCSJ.

On April 12, 2002, Bocobo filed a twelve-count complaint against RCSJ, Alliance,

6

Chase, and SJHS (collectively, Defendants).[2] In Counts 1 and 2, Bocobo alleged that

Defendants violated the Sherman Act, 15 U.S.C. §§ 1 and 2, and the New Jersey Antitrust

Act (NJAA), N.J. Stat. Ann. § 56:9-1 to -19. Count 3 alleged that RCSJ, Alliance, and

Chase terminated Bocobo's employment in violation of New Jersey's whistleblower

statute, the New Jersey Conscientious Employee Protection Act (CEPA), N.J. Stat. Ann.

§ 34:19-1 to -14. Count 4 asserted that SJHS revoked Bocobo's hospital privileges

contrary to public policy. Count 5 pleaded that RCSJ, Alliance, and Chase breached their

fiduciary duties to Bocobo, and it was later amended to assert a civil conspiracy claim

alleging that SJHS assisted and encouraged that breach. Count 6 claimed Defendants

breached Bocobo's Employment Contract.[3] Count 8 asserted that Defendants defamed

Bocobo and committed trade libel against him. Finally, Count 10 alleged that Defendants

tortiously interfered with Bocobo's prospective economic advantages.

On February 25, 2004, the District Court granted Defendants' motion for partial

summary judgment and dismissed Bocobo's federal and state antitrust claims (Counts 1

---

[2] Bocobo's brief does not assert error in the resolution of Counts 7, 9, 11, and 12, or in Counts 13, 14, and 15, which were added in an amended complaint. Additionally, it offers no argument regarding his defamation claim under Count 8. Therefore, he has waived any arguments regarding the resolution of Counts 7, 8 (as to defamation only), 9, and 11 through 15. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005).

[3] Although it is unclear from Bocobo's complaint whether he intended to include SJHS as a defendant in Count 6, the District Court found the conduct charged in Count 6 "factually interrelated" to other counts in which SJHS was a named defendant and treated SJHS as a Count 6 defendant. We do the same.

7

and 2). On November 22, 2005, the Court granted complete summary judgment for SJHS on all remaining claims against it (Counts 4, 5, 6, 8, and 10) and for RCSJ, Alliance, and Chase on Counts 3, 8, and 10. On Counts 5 and 6, the District Court granted RCSJ, Alliance, and Chase only partial summary judgment, dismissing those claims only insofar as they were grounded in Bocobo's loss of medical staff privileges at SJHS. Bocobo then proceeded to a jury trial against RCSJ, Alliance, and Chase on his shareholder-based claims and an alleged breach of a Deferred Compensation Agreement with RCSJ. The jury found in Bocobo's favor and awarded him $300,000. The District Court has resolved all post-judgment motions, and Bocobo's timely appeal of the summary judgment orders is now properly before us.[4]

II

We exercise plenary review over the District Court's orders. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Summary judgment is appropriate only where, viewing the facts "in the light most favorable to the nonmoving party," *Scott v. Harris*, 550 U.S. 372, 380 (2007), there is "no genuine dispute as to any material fact," such that he is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec.*

---

[4] The District Court had jurisdiction pursuant to 15 U.S.C. §§ 1, 2, and 15, and 28 U.S.C. §§ 1331 and 1332. We have jurisdiction under 28 U.S.C. § 1291.

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal

quotation marks omitted).

A

We begin with Bocobo's antitrust claims under sections one and two of the

Sherman Act and the NJAA.[5]  With respect to Sherman Act § 1, which prohibits

contracts, combinations, and conspiracies that impose unreasonable restraints on trade, 15

U.S.C. § 1; *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010)

(citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911)), Bocobo alleges that

Defendants conspired to boycott him in the local radiology market and used illegal tying

arrangements to link radiology services to hospital services.  He also asserts that SJHS

and Chase violated § 2 by signing exclusive contracts intended to monopolize the

outpatient and hospital radiology markets.  *See* 15 U.S.C. § 2 (creating liability for

"[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade

or commerce among the several States").  This, Bocobo says, was designed to free SJHS

from competing on quality and led to substandard radiology services.

Bocobo's ability to bring an antitrust claim is dependent on § 4 of the Clayton Act,

---

[5] Substantively, the NJAA is "virtually identical" to the Sherman Act, and the New Jersey legislature "intended the [NJAA] as consistent with federal antitrust law, and expressly provided that it 'be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws.'"  *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 920 (N.J. Super. Ct. 1995) (quoting N.J. Stat. Ann. § 56:9-18).  Accordingly, our analysis of Bocobo's federal antitrust claims in Count 1 applies to his NJAA claims in Count 2, and

5 U.S.C. § 15, which limits private antitrust suits to those who have been injured by conduct forbidden by the antitrust laws. *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 875 (3d Cir. 1995) (citing 5 U.S.C. § 15(a)). To establish his standing to sue, Bocobo must demonstrate: (1) that he has suffered an "antitrust injury"; and (2) that he is the proper plaintiff to bring the claim. *See, e.g.*, *Alberta Gas Chems., Ltd. v. E.I. DuPont de Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987). "An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" *W. Penn Allegheny Health*, 627 F.3d at 101 (alteration in original) (citation omitted) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "If antitrust injury is not found, further inquiry is unnecessary." *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998).

The District Court granted summary judgment to Defendants after finding that Bocobo had not demonstrated antitrust injury. Defining the market for radiology jobs as including, "at the very least, southern New Jersey and the Philadelphia area," *Bocobo v. Radiology Consultants of S. Jersey (Bocobo I)*, 305 F. Supp. 2d 422, 426 (D.N.J. 2004), the District Court concluded that Bocobo had presented no evidence that his exclusion from Alliance had negatively impacted that market. Looking to the consumer market for

we resolve both counts together.

radiology services, the District Court likewise found no indication in the record that Bocobo's exclusion from SJHS's Cumberland County hospitals had affected consumer choice or the price or quality of radiology services.

Bocobo argues that the District Court abandoned the summary judgment standard, made conclusions that are reserved to experts and the jury, and improperly rejected his proposed definitions of the relevant product and geographic markets. We find no such errors in the District Court's reasoning.[6]

Viewing the evidence in his favor, Bocobo has not established a nexus between his purported exclusion from the market for radiology jobs and the anticompetitive effects on that market that would make Defendants' exclusive contracts or alleged boycott illegal under the antitrust laws. *See, e.g.*, *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 335–36 (1990) (holding that losses resulting from a competitor's vertical, maximum price-fixing agreements were not "'*antitrust* injury,' since [the] losses d[id] not flow from the aspects of vertical, maximum price fixing that render it illegal"); *Brunswick*, 429 U.S. at 489; *W. Penn Allegheny Health*, 627 F.3d at 102 (finding no antitrust injury to a hospital where "Highmark's elimination of [its low-cost insurance plan] violated the

---

[6] Preliminarily, we reject Bocobo's objections to the District Court's act of defining the relevant product and geographic markets rather than preserving that question for the jury. It was proper for the District Court to delimit the market in order to assess antitrust injury at the summary judgment stage. *Cf., e.g.*, *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) (upholding summary judgment based on a lack of antitrust injury where the district court's decision depended heavily on its definition of the relevant product market).

11

antitrust laws, if at all, because it tended to reduce competition in the . . . market for *health insurance*," not medical services (emphasis added)); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (upholding summary judgment based on a lack of standing where an anesthesiologist-plaintiff alleging exclusive dealing failed to show that multi-state and national competition for anesthesiologist positions had been hampered).

Bocobo has not shown that he was excluded entirely from the radiology job market;[7] within two weeks of his termination from RCSJ, he obtained a radiology position with a nearby hospital. *Compare, e.g.*, *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 274 (3d Cir. 1999) (reversing summary judgment for the defendant where "the injury [Angelico] suffered, when *shut out* of competition for anticompetitive reasons, [was] indeed among those the antitrust laws were designed to prevent" (emphases added)), *with, e.g.*, *Untracht v. Fikri*, 454 F. Supp. 2d 289, 309–10 (W.D. Pa. 2006) (finding no antitrust injury, even where the plaintiff's staff privileges were revoked at several hospitals, because he maintained the option of practicing at at least one area

---

[7] We find the District Court's definition of the relevant geographic market for radiology jobs proper, given uncontested evidence that: (1) SJHS recruited radiologists from Colorado; (2) Chase was hired from Camden County, New Jersey; and (3) Bocobo himself searched for a new position at least as far as the Philadelphia area. *See, e.g.*, *Jefferson Parrish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984) (noting that the market for anesthesiologist jobs "is not necessarily the same as the market in which hospitals compete in offering services to patients . . . [and that] it may encompass competition among anesthesiologists for exclusive contracts . . . and might be statewide or merely local"), *abrogated in part on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Balaklaw*, 14 F.3d at 799; *Collins v. Assoc. Pathologists Ltd.*, 844 F.2d 473, 478–79 (7th Cir. 1988).

hospital).

Nor has Bocobo demonstrated that Defendants' conduct was anticompetitive. Specifically, he has failed to show that their behavior leading to his exclusion—the change of contractor in a long-standing practice of exclusive contracting for radiology services—is the type that might lessen competition among radiology providers for the right to practice in the eastern Pennsylvania and south New Jersey areas. *See, e.g.*, *B & H Med., LLC v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008) (finding no antitrust injury where the "record [was] devoid of evidence that *competition as a whole* ha[d] suffered as a result of [an] exclusive [contract] . . . program" (citation and internal quotation marks omitted)); *Balaklaw*, 14 F.3d at 799; *Steuer v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1501–02 (D.S.C. 1987) (finding no standing where former exclusive contractors brought antitrust conspiracy claims against the hospital and the successor exclusive contractor because "reduced to its essentials, [the] plaintiffs' . . . Complaint rest[ed] not on any showing of lessened competition, but merely on the fact that they [were] disappointed competitors who [were forced to] provide their services elsewhere").

Finally, Bocobo has failed to establish that his displacement stemmed directly from conduct that is illegal because of its anticompetitive effects on the price, output, or quality of radiology services available to consumers, such as illegal tying arrangements or monopoly behavior. *See, e.g.*, *Jefferson Parrish*, 466 U.S. at 26 (measuring the anticompetitive effects of tying anesthesiology services to hospital care by looking to the

13

consumer market for anesthesiology). *See generally Angelico*, 184 F.3d at 274 (noting that the "directness of the injury" bears on antitrust standing). Bocobo argues that Defendants' market position and exclusive contracts allow them to provide substandard radiology services and reduce consumer choice, but there is no indication that Defendants' actions that resulted in Bocobo's ouster from SJHS hospitals or Cumberland County might cause such harms. As the District Court explained, consumers of radiology services rarely shop around for radiologists or learn who interpreted their scans and X-rays. If consumers are likely to be harmed by Defendants' exclusive contracts, those "effects will not be missed by patient-consumers or insurers," who are better positioned than Bocobo to challenge Defendants' practices. *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 719 (7th Cir. 2006).

Viewed in Bocobo's favor, the evidence shows merely that Bocobo was displaced when SJHS granted its exclusive contract to a new company better suited for SJHS's plans to consolidate its hospitals. Losing out in such competition is not an anticompetitive harm. *Cf., e.g.*, *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("It is well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged*."). In the absence of a link between Bocobo's losses and the anticompetitive aspects of exclusive contracts, boycotts, tying arrangements, and monopolies, we agree with the District Court that Bocobo lacks standing to assert his antitrust claims. Therefore, summary judgment was appropriate on

14

Counts 1 and 2.

B

We next consider Bocobo's claim at Count 3 that RCSJ, Alliance, and Chase violated New Jersey's whistleblower statute by terminating him based on his complaints regarding their radiology policies and practices.[8] *See* CEPA, N.J. Stat. Ann. § 34:19-1 to -8. A CEPA plaintiff must show that

> (1) he . . . reasonably believed that his . . . employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he . . . performed a "whistle-blowing" activity . . . ; (3) an adverse employment action was taken against him . . . ; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). The plaintiff need not "set forth facts that, if true, would constitute a violation of [a statute]," *id.* at 903, but he must establish a "substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff," *id.* at 901; *accord Caver v. City of Trenton*, 420 F.3d 243, 254 (3d Cir. 2005).

The District Court granted summary judgment for Defendants, finding the absence of a genuine issue of material fact regarding the causation element of Bocobo's CEPA

---

[8] We reject Defendants' argument that Bocobo's CEPA claim is barred by the statute of limitations. In CEPA cases, "the employee's cause of action . . . accrues on the date of actual discharge[,] . . . [which is] the last day for which the employee is paid a regular salary or wage," *Alderiso v. Med. Ctr. of Ocean Cnty., Inc.*, 770 A.2d 275, 277 (N.J. 2001), and Bocobo brought his suit well within one year of his final day of work, July 13, 2001.

15

claim. Specifically, the Court reasoned that Bocobo had been complaining since 1985 and that no reasonable jury could find that his termination in 2000 was motivated by anything other than his own "difficult personality." *Bocobo v. Radiology Consultants of S. Jersey, PA (Bocobo II)*, No. 02-1697, 2005 WL 3158053, at \*4 (D.N.J. Nov. 21, 2005). Bocobo argues that the District Court misapplied the summary judgment standard by implicitly crediting testimony indicating that he was excluded from Alliance merely because hospital staff and RCSJ colleagues disliked working with him. Defendants respond that summary judgment was fully supported by both a lack of causation and Bocobo's failure to identify the specific regulations or laws he complained were being violated. We agree with the District Court that, as is true "in most CEPA cases," Bocobo's claim "turn[s] on the fourth element: evidence of a causal connection" between his termination and his purported whistle-blowing. *Donofry v. Autotote Sys., Inc.*, 795 A.2d 260, 269 (N.J. Super. Ct. 2001). Because we also agree that no genuine issue of material fact exists as to whether Bocobo's termination resulted from his complaints, rather than his own failings, we will affirm the grant of summary judgment on Bocobo's CEPA claim.

Bocobo's CEPA claim depends on circumstantial evidence, so we apply the burden-shifting framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fleming v. Corr. Healthcare Solutions, Inc.*, 751 A.2d 1035, 1041 (N.J. 2000). Even assuming that Bocobo has made out a prima facie case of retaliation, he cannot satisfy his

16

burden of discrediting Defendants' legitimate, non-retaliatory explanation for his exclusion from Alliance as implausible, inconsistent, incoherent, or contradictory. *Compare, e.g.*, *Blackburn v. UPS, Inc.*, 179 F.3d 81 (3d Cir. 1999) (upholding summary judgment for UPS where Blackburn raised alarms of potential antitrust violations without any sophisticated knowledge of antitrust and where the record provided him no fodder to undermine UPS's proffered legitimate explanations that it terminated him for his own violations of UPS's anti-nepotism, favoritism, integrity and accountability policies); *Campbell v. Abercrombie & Fitch, Co.*, No. 03-3159, 2005 WL 1387645 (D.N.J. June 9, 2005) (granting summary judgment on a store employee's CEPA claim, despite his allegations that he was fired for voicing concerns about discriminatory hiring practices, because no evidence assailed Abercrombie & Fitch's legitimate, non-retaliatory explanation that the employee had misrepresented himself at other store locations in order to conduct unauthorized undercover investigations), *with, e.g.*, *Schlichtig v. Inacom Corp.*, 271 F. Supp. 2d 597 (D.N.J. 2003) (finding that Inacom's explanation that it fired the plaintiff for conducting unauthorized background checks of other employees, rather than for reporting a coworker's marijuana use to police against Inacom's instructions, was discredited by evidence that, after first learning of the unauthorized background checks, Inacom gave express permission for the plaintiff to conduct further investigations).

As in *Blackburn* and *Campbell*, the record in Bocobo's case is replete with evidence bolstering Defendants' non-retaliatory explanation for his termination. The

17

record indicates that he caused delays in the operations of the radiology department, refused to cooperate, and generated friction through his idiosyncratic practices and requests. We need not weigh the credibility of the witnesses who offered such testimony—and neither did the District Court—because Bocobo offers no contrary evidence aside from his own self-serving allegations. Rather, he merely posits the alternative view that he was terminated for expressing his disagreements with Defendants' patient care. But that claim is significantly undermined by the fact that RCSJ and Chase took no action in response to his complaints for at least eight years—from the creation of RCSJ in 1993 until its dissolution in 2001. The temporal proximity of a CEPA plaintiff's termination to his alleged whistle-blowing is important circumstantial evidence of the employer's motivation, *see, e.g.*, *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997), and Bocobo's lengthy employment despite his complaints distinguishes his case from those in which CEPA claims have been countenanced, *see, e.g.*, *Caver*, 420 F.3d at 249–52 (alleged retaliation within six months of first complaints); *Schlichtig*, 271 F. Supp. 2d at 613 (termination two weeks after complaints). Given the strong evidence supporting Defendants' proffered legitimate, non-retaliatory reason for excluding Bocobo from Alliance and Bocobo's failure to call that justification into question, we readily conclude that no reasonable jury could have found in Bocobo's favor on his CEPA claim. Accordingly, we will affirm the District Court's summary judgment on Count 3.

18

C

We now turn to Bocobo's claim of trade libel in Count 8. Under New Jersey law,

to prove trade libel a plaintiff must show

> publication of a matter derogatory to the plaintiff's property or business, of a kind designed to prevent others from dealing with him or otherwise to interfere with plaintiff's relations with others. . . . The communication must be made to a third person and must play a material part in inducing others not to deal with plaintiff. . . . [W]hereas the need to demonstrate damages is [sometimes] waived in a defamation suit[,] . . . proof of damages is essential in an action for trade libel.

*Patel v. Soriano*, 848 A.2d 803, 834 (N.J. Super. Ct. 2004) (internal citations omitted);

*accord Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 424 (D.N.J. 2005)

(Trade libel requires proof of: "(1) publication, (2) with malice, (3) of false allegations

concerning [the plaintiff's] property, product or business, and (4) special damages."

(citing *FDIC v. Bathgate*, 27 F.3d 850, 870–71 (3d Cir. 1994))).

Bocobo dedicates only one sentence of his opening brief to his trade libel claim.

He argues that the District Court's finding that he could not demonstrate special damages

was based on the erroneous conclusion that RCSJ could terminate him without cause

under the Employment Contract.[9]

---

[9] In his reply brief, as in his briefs before the District Court, Bocobo asserts in much greater detail that SJHS and Chase collected "anecdotal allegations" about him in a "secret personal file" and published false and misleading statements to hospital personnel, RCSJ, and Alliance based on "one-sided and incomplete portrayals of events." **(Reply 22.)** Bocobo claims SJHS and Chase knew the stories were false or recklessly disregarded their unreliability. Because Bocobo did not raise this argument in his opening brief, he waived it, *see Pelullo*, 399 F.3d at 222, and we consider only his

As the Court noted, Bocobo had to "'allege either loss of particular customers by name, or a general diminution of business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication.'" *Bocobo II*, 2005 WL 3158053, at *8 (quoting *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004)).  We agree with the District Court that his trade libel claim fell short in this respect.  His complaint pleaded only general losses, including avoidance by his peers, loss of goodwill and respect, and "substantial money damages, including but not limited, to damages to his personal and business reputation."  Bocobo failed to allege any loss of patients, let alone specifically named patients, and he did not show that the difference between his prior salary with RCSJ and his current salary with the University of Pennsylvania, even if construed as specific damages, was a *direct* result of Defendants' purportedly libelous statements.  Rather, the only reasonable reading of the record shows that Bocobo's colleagues at RCSJ believed he was "difficult" and did not wish to associate with him further based on their own extensive personal interactions with him and his work-related deficiencies, such as inaccessibility and combativeness.  Therefore, we will uphold summary judgment for SJHS and Chase on Count 8.

D

Bocobo's remaining claims at Counts 4, 5, 6, and 10 can be disposed of summarily.

---

challenge to the District Court's ruling on special damages.

1

At Count 4, Bocobo alleged a violation of public policy under *Nanavati v. Burdette Tomlin Memorial Hospital*, 526 A.2d 697 (N.J. 1987). Although *Nanavati* stands for the proposition that a hospital must afford a physician due process before revoking his privileges, the case is inapposite here because, from SJHS's perspective, Bocobo's privileges were terminated not because of any belief as to his medical competence or personality, but rather by operation of contract once he ceased practicing radiology for SJHS's exclusive provider. *See Bloom v. Clara Maass Med. Ctr.*, 685 A.2d 966, 973 (N.J. Super. Ct. 1996) (holding that the "decision to award an exclusive contract for the provision of radiological services, which le[ads] to the revocation of [a doctor's] staff privileges, constitute[s] a reasonable management decision" under *Nanavati*); *Courtney v. Shore Mem'l Hosp.*, 584 A.2d 817, 819 (N.J. Super. Ct. 1990) ("*Nanavati* deals with disharmony-personality difficulties which are largely subjective . . . . An objective violation of a specific rule or regulation is quite different.") (holding that revocation of the plaintiff's privileges when he let his medical malpractice insurance lapse did not have to satisfy *Nanavati*).

2

At Count 5, Bocobo alleged civil conspiracy against SJHS. This claim fails for two independent reasons. First, we readily agree with the District Court's conclusion that, under the plain language of the Employment Contract, after September 30, 1995,

21

either party could terminate Bocobo's employment upon ninety days' notice, with or without cause. The additional clause providing for immediate termination without notice "for cause" did not alter RCSJ's ability under the preceding clause to terminate Bocobo merely upon ninety days' notice. Because Bocobo's termination was permitted under his contract, any collaboration among Defendants to terminate Bocobo lacked the "unlawful purpose or . . . lawful purpose achieved by unlawful means" or the "wrongful act" required for Bocobo's civil conspiracy and aiding and abetting claims under Count 5. *See, e.g.*, *Morganroth & Morganroth v. Norris, McLaughlin & Marcus*, 331 F.3d 406, 414–15 (3d Cir. 2003) (setting forth the elements of civil conspiracy and aiding and abetting). Second, we agree with the District Court that Bocobo failed to adduce sufficient evidence suggesting that SJHS participated in or encouraged his ouster from RCSJ and exclusion from Alliance. Evidence that Chase had discussions with the SJHS administration prior to terminating Bocobo—even including Zeccardi's testimony that he told Chase of an instance in which a newly formed physicians' group eliminated a prior partner—does not establish that SJHS recommended that Bocobo be removed from the radiology group. Indeed, the only direct testimony presented on the subject consists of SJHS's CEO's and RCSJ's legal counsel's flat denials that they ever discussed Bocobo "whatsoever" in preparation for Exclusive Contract II between SJHS and Alliance.

3

At Count 6, Bocobo alleged breach of contract by all Defendants. This claim fails

22

against RCSJ and Chase because, as we explained above, Bocobo's Employment Contract permitted termination without cause so long as he received ninety-days' notice. As to SJHS, Exclusive Contract I contemplated that Bocobo's privileges would be revoked automatically the moment he was no longer employed by RCSJ, so SJHS committed no breach by denying Bocobo hospital privileges.

4

Finally, at Count 10, Bocobo alleged tortious interference against SJHS, RCSJ, and Chase. Pitting Defendants against each other, he claims that SJHS interfered with his prospective contractual relationship with RCSJ and Chase, and vice versa. But SJHS could not have committed tortious interference because after September 30, 1995, the Employment Contract gave Bocobo no "reasonable expectation of economic benefit or advantage" in his position with RCSJ, which is an essential element of a tortious interference claim. *See, e.g.*, *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir. 1992) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989)); *Printing Mart-Morristown*, 563 A.2d at 37 ("A complaint based on tortious interference must allege facts that show some protectable right—a prospective economic or contractual relationship."). Nor could RCSJ have interfered with Bocobo's prospective contractual relationship with SJHS. It merely fired him pursuant to the Employment Contract, which could not constitute a "wrongful, intentional interference." *See Fineman*, 980 F.2d at 186; *accord Printing Mart-Morristown*, 563 A.2d at 39.

Moreover, after September 30, 1995, when he became terminable from RCSJ without cause, Bocobo lacked a reasonable expectancy in his SJHS privileges, which were dependent on his RCSJ employment.

5

In sum, because Bocobo's termination from RCSJ, exclusion from Alliance, and loss of staff privileges at SJHS were all permissible under the governing contracts, and because the revocation of his privileges was automatic upon his termination from RCSJ, summary judgment was appropriate for all Defendants on Bocobo's claims for wrongful termination (Count 4), civil conspiracy and aiding and abetting (Count 5), breach of contract (Count 6), and tortious interference (Count 10).

III

For the foregoing reasons, we will affirm the District Court's summary judgment on all counts and against all Defendants.